933 S.W.2d 1 (1996)
S.V., Petitioner,
v.
R.V., Respondent.
No. 94-0856.
Supreme Court of Texas.
Argued February 8, 1996.
Decided March 14, 1996.
Rehearing Overruled November 15, 1996.
Concurring Opinion November 15, 1996.
Concurring Opinion on Rehearing November 15, 1996.
*2 Joann N. Wilkins, David M. Weaver, Dallas, for Petitioner.
Mike Patterson, Tyler, Jam Ferguson, Austin, for respondent.
Concurring Opinion by Justice Cornyn November 15, 1996.
Concurring Opinion on Rehearing by Justice Gonzalez November 15, 1996.
*3 HECHT, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, and ENOCH, SPECTOR, BAKER and ABBOTT, Justices, join.
R. intervened in her parents' divorce proceeding, alleging that her father, S., was negligent by sexually abusing her until she was seventeen years old. (Given the sensitive nature of these allegations, we refer to the parties only by initials to avoid the use of proper names.) Because R. did not sue her father within two years of her eighteenth birthday as required by the applicable statutes of limitations, her action is barred as a matter of law unless the discovery rule permits her to sue within two years of when she knew or reasonably should have known of the alleged abuse. R. contends that the discovery rule should apply in this case because she repressed all memory of her father's abuse until about a month after she turned twenty, some three months before she intervened in the divorce action. The district court directed a verdict against R. on the grounds that the discovery rule does not apply in this case, and that R. adduced no evidence of abuse. A divided court of appeals reversed and remanded for a new trial. 880 S.W.2d 804. We reverse the judgment of the court of appeals and affirm the judgment of the district court on limitations grounds.

I
Before we review the evidence in this case it is important to have clearly in mind the issue that is crucial in determining whether to apply the discovery rule. To pose that issue we begin with an analysis of our discovery rule jurisprudence.
We have long recognized the salutary purpose of statutes of limitations. In Gautier v. Franklin, 1 Tex. 732, 739 (1847), we wrote that statutes of limitations
are justly held "as statutes of repose to quiet titles, to suppress frauds, and to supply the deficiencies of proof arising from the ambiguity, obscurity and antiquity of transactions. They proceed upon the presumption that claims are extinguished, or ought to be held extinguished whenever they are not litigated in the proper forum at the prescribed period. They take away all solid ground of complaint, because they rest on the negligence or laches of the party himself; they quicken diligence by making it in some measure equivalent to right...." [Joseph P. Story, Conflicts of Law 482.]
More recently, we explained:
Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. The purpose of a statute of limitations is to establish a point of repose and to terminate stale claims.
Murray v. San Jacinto Agency, Inc., 800 S.W.2d 826, 828 (Tex.1990).
The enactment of statutes of limitations is, of course, the prerogative of the Legislature. At the time this case was filed and tried, the applicable statute was the one governing personal injury actions generally, which provided: "A person must bring suit for ... personal injury ... not later than two years after the day the cause of action accrues." Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex.Gen.Laws 3242, 3252, formerly codified as Tex.Civ.Prac. & Rem. Code § 16.003(a). The code contains two other provisions relevant to this case. One is: "If a person entitled to bring a personal action is under a legal disability when the cause of action accrues, the time of the disability is not included in the limitations period." Tex.Civ.Prac. & Rem.Code § 16.001(b). The other is: "For the purposes of this subchapter, a person is under a legal disability if the person is: (1) younger than 18 years of age...." Id. § 16.001(a). Thus, a person has until his or her twentieth birthday (or the next business day, id. § 16.072) to bring suit for personal injury from sexual assault ifand here we come to the root of the problem in the case before usthe cause of action "accrued" while the person was a minor.
*4 In 1995, the Legislature enacted a special five-year statute of limitations for sexual abuse cases: "A person must bring suit for personal injury not later than five years after the day the cause of action accrues if the injury arises as a result of conduct that violates: (1) Section 22.011, Penal Code (sexual assault); or (2) Section 22.021, Penal Code (aggravated sexual assault." Tex.Civ.Prac. & Rem.Code § 16.0045(a); Act of May 27, 1995, 74th Leg., R.S., ch. 739, 1995 Tex.Gen.Laws 3850. This new statute was not enacted until long after the present case was filed and tried and therefore does not govern. Raley v. Wichita County, 123 Tex. 494, 72 S.W.2d 577, 579 (1934). We mention it here to point out that under both the new statute and its predecessor, the prescribed period begins to run on the day the cause of action "accrues".
Many other statutes peg the beginning of the limitations period on the date the cause of action "accrues". Occasionally the date of accrual is defined. E.g., TEX.CIV. PRAC. & REM.CODE § 16.003(b) (a wrongful death cause of action "accrues on the death of the injured person"). More often, however, the definition of accrual is not prescribed by statute and thus has been left to the courts. As a rule, we have held that a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. Trinity River Auth. v. URS Consultants, Inc., 889 S.W.2d 259, 262 (Tex.1994); Quinn v. Press, 135 Tex. 60, 140 S.W.2d 438, 440 (1940). We have not applied this rule without exception, however, and have sometimes held that an action does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. Trinity River Auth., 889 S.W.2d at 262. (Deferring accrual and thus delaying the commencement of the limitations period is distinct from suspending or tolling the running of limitations once the period has begun.)
We first referred to this exception as the "discovery rule" in Gaddis v. Smith, 417 S.W.2d 577, 578 (Tex.1967). We have sometimes used the phrase to refer generally to all instances in which accrual is deferred, including fraud and fraudulent concealment. Williams v. Khalaf, 802 S.W.2d 651, 657 (Tex.1990) (citing a case that "involved the `discovery rule' since there was a claim of fraudulent concealment"); Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990) (citing fraud case as one in which discovery rule applied). See also Robinson v. Weaver, 550 S.W.2d 18, 24 n. 2 (Tex.1977) (Pope, J., dissenting) ("The `discovery rule' applies in actions based on fraud ... and fraudulent concealment in medical malpractice cases...."). At other times we have distinguished between fraudulent concealment and the discovery rule. Willis v. Maverick, 760 S.W.2d 642, 647 (Tex.1988) (besides asserting the discovery rule, plaintiff also alleged that fraudulent concealment tolled limitations); Weaver v. Witt, 561 S.W.2d 792, 793-794 (Tex.1977) (per curiam) (noting that if defendant moves for summary judgment on limitations, the burden of proving fraudulent concealment to avoid summary judgment is on the plaintiff, but the burden of proving the date plaintiff knew or should have known of injury to obtain summary judgment is on defendant); Nichols v. Smith, 507 S.W.2d 518, 521 (Tex.1974) (noting that plaintiff asserted fraudulent concealment only and not the discovery rule). See also Murray, 800 S.W.2d at 831 (Spears, J., dissenting) ("Fraudulent concealment gives rise to another such practical exception [besides the discovery rule] to the injury based rule of accrual."); Moreno, 787 S.W.2d at 367 n. 6 (Doggett, J., dissenting) (referring to "common-law tolling principles such as the doctrine of fraudulent concealment and the discovery rule.") Strictly speaking, the cases in which we have deferred accrual of causes of action for limitations purposes fall into two categories: those involving fraud and fraudulent concealment, and all others. The deferral of accrual in the latter cases is properly referred to as the discovery rule. We observe the distinction between the two categories because each is characterized by different substantive and procedural rules. Weaver, 561 S.W.2d at 793-794. See American Petrofina, Inc. v. Allen, 887 S.W.2d 829 (Tex.1994); Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex.1988).
*5 We have considered the applicability of the deferred accrual exception to the legal injury rule in an assortment of settings. See Willis, 760 S.W.2d at 646 (attorney malpractice in drafting divorce decree led to forced partition of home; held discovery rule applies when lawyer's expertise and client's ignorance of the law make wrong undiscoverable); Nelson v. Krusen, 678 S.W.2d 918, 923 (Tex.1984) (child born with muscular dystrophy after doctor informed parents that mother did not carry muscular dystrophy gene; held statute precluding discovery rule was unconstitutional); Weaver, 561 S.W.2d at 794 (negligently performed hemorrhoidectomy damaged plaintiff's rectal nerves and muscles, causing loss of bowel control; held doctor's affidavit of last examination date was insufficient to negate discovery rule); Robinson, 550 S.W.2d at 22 (misdiagnosis when one disc repaired and another later removed; held discovery rule did not apply when fact of injury was unclear and no physical evidence established negligence); Kelley v. Rinkle, 532 S.W.2d 947, 949 (Tex.1976) (false and libelous credit report unsuspected until plaintiff refused credit; held discovery rule applies despite strong counterargument based on "intangible nature of the evidence and of the injury"); Nichols, 507 S.W.2d at 519-520 (nerves severed during operation and plaintiff assured that nerves would heal, and plaintiff's digestive disorders attributable to mistake; held accrual not delayed because fraudulent concealment not shown and discovery rule not alleged); Hays v. Hall, 488 S.W.2d 412, 414 (Tex.1972) (negligence in performing vasectomy confirmed by subsequent pregnancy; held discovery rule applies); Gaddis, 417 S.W.2d at 580 (foreign object left in patient's body during surgery; held discovery rule applies); International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 580 (Tex.1963) (corporate officers and directors engaged in self-dealing, received commissions on stock sales, and sold personal shares of corporate stock in competition with corporation's own offerings; held accrual was delayed for property sale and commissions, and fact issue existed as to whether personal stock sales were discoverable by board); Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 394 (1945) (secret dealings by trustee who conceded application of discovery rule; held facts did not alert beneficiary to delve into transactions); Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 740 (1943) (use of inferior, noncomplying felt under roof shingles, spaced too far apart, discovered only when roof completely torn up; held fraud delayed accrual because roof and felt were invisible from ground and because homeowner trusted general contractor to inspect); Quinn, 140 S.W.2d at 441 (loan contract fraud discovered, but suit not brought until remedies under contract exhausted; held fraud action accrues from time of discovery, not when damages ascertained with certainty); Port Arthur Rice Milling Co. v. Beaumont Rice Mills, 105 Tex. 514, 143 S.W. 926, 929 (1912) (fraud in chattel mortgage admitted; held discovery rule applies when plaintiff did not and could not have discovered defendant's representations were false); Houston Water-Works Co. v. Kennedy, 70 Tex. 233, 8 S.W. 36, 38 (1888) (property damage to building; held discovery rule did not apply); Rowe v. Horton, 65 Tex. 89, 92 (1885) (mutual mistake in land conveyance; held even if discovery rule applied, plaintiff did not show due diligence); Kuhlman v. Baker, 50 Tex. 630, 637 (1879) (land fraud in giving an illiterate a quitclaim deed representing it as warranty deed; held while fraud tolls limitations, plaintiff failed to exercise due diligence in discovering fraud); Fibreboard Corp. v. Pool, 813 S.W.2d 658, 679 (Tex.App.Texarkana 1991), writ granted, 35 Tex.Sup.Ct.J. 674 (Apr. 29, 1992), writ denied as improvidently granted, 36 Tex. Sup.Ct.J. 162 (Nov. 11, 1992), cert. denied, 508 U.S. 909, 113 S.Ct. 2339, 124 L.Ed.2d 250, 509 U.S. 923, 113 S.Ct. 3037, 125 L.Ed.2d 724, 509 U.S. 933, 113 S.Ct. 3064, 125 L.Ed.2d 746 (1993) (report stated plaintiff's chest x-ray consistent with asbestosis, but plaintiff was not informed of the report; held discovery rule applied); Turner v. PV Int'l Corp., 765 S.W.2d 455, 468 (Tex.App. Dallas 1988), writ denied per curiam, 778 S.W.2d 865 (Tex.1989) (extramarital affair admitted in alienation of affections suit; held discovery rule applied).
The justifications we have offered for deferring accrual have been diverse, somewhat *6 inconsistent, and often overly broad. Fraud, we have said, in and of itself prevents running of the statute of limitations, e.g., Ruebeck, 176 S.W.2d at 739; Port Arthur Rice Milling, 143 S.W. at 929, as does fraudulent concealment, e.g., Nichols v. Smith, 507 S.W.2d 518, 519-520 (Tex.1974); Estate of Stonecipher v. Estate of Butts, 591 S.W.2d 806, 809 (Tex.1979); Borderlon v. Peck, 661 S.W.2d 907, 908-909 (Tex.1983). We have applied the discovery rule because of a special relationship between the plaintiff and defendant. E.g., Willis, 760 S.W.2d at 645-646 (attorney and client); Slay, 187 S.W.2d at 388-393 (trustee and beneficiary). Even apart from such a relationship, we have indicated that the discovery rule applies when it is otherwise difficult for the injured party to learn of the wrongful act. Gaddis, 417 S.W.2d at 580 (leaving surgical sponge in plaintiff's body). We have characterized barring claims before plaintiffs knew they had them "shocking results". Id. at 581. On the other hand, we have observed:
Statutes of limitations are not directed to the merits of any individual case, they are a result of legislative assessment of the merits of cases in general. The fact that a meritorious claim might thereby be rendered nonassertible is an unfortunate, occasional by-product of the operation of limitations. All statutes of limitations provide some time period during which the cause of action is assertible. However, preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute. The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind.
Robinson, 550 S.W.2d at 20. A principal factor in deciding whether to apply the discovery rule has been to what extent the claim was objectively verifiable. E.g., Gaddis, 417 S.W.2d at 581 (leaving a surgical sponge in a body "is a peculiar type of case which is not particularly susceptible to fraudulent prosecution"); Robinson, 550 S.W.2d at 21 ("Unlike Gaddis v. Smith there exists in the present case [alleging misdiagnosis of herniated intervertebral disc] no physical evidence which in-and-of-itself establishes the negligence of some person."); Kelly, 532 S.W.2d at 949 (credit defamation clear from written report).
While the language in the opinions in these cases varies, a general principle unites them. Computer Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453 (Tex.1996). Accrual of a cause of action is deferred in two types of cases. In one type, those involving allegations of fraud or fraudulent concealment, accrual is deferred because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run. The other type, in which the discovery rule applies, comprises those cases in which "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." Id. at 456. These two elements of inherent undiscoverability and objective verifiability balance the conflicting policies in statutes of limitations: the benefits of precluding stale or spurious claims versus the risks of precluding meritorious claims that happen to fall outside an arbitrarily set period. Restated, the general principle is this: accrual of a cause of action is deferred in cases of fraud or in which the wrongdoing is fraudulently concealed, and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified. This principle, while not expressed in every deferred accrual case, is derived from them and best defines when the exception to the legal injury rule has been and should be applied.
We have considered the "inherently undiscoverable" element of the discovery rule in several cases. Willis, 760 S.W.2d at 645 (lawyer's error could not be discovered by client who was ignorant of the law); Nelson, 678 S.W.2d at 923 (malpractice in muscular dystrophy gene screening could not be discovered by parents until child showed symptoms); Kelley, 532 S.W.2d at 949 (false credit report could not be discovered until credit denied); Hays, 488 S.W.2d at 414 ("One who undergoes a vasectomy ... and then after tests is told that he is sterile, cannot know that he is still fertile ... until either his wife becomes pregnant or he is shown to be fertile by further testing."); Gaddis, 417 S.W.2d *7 at 578 ("it is often difficult, if not impossible, to discover that a foreign object has been left within the body within the statutory period of limitation"); International Bankers, 368 S.W.2d at 580-581 (disinterested directors could not discover certain corporate self-dealing); Ruebeck, 176 S.W.2d at 739 (homeowner could not discover faulty construction of roof); Sherman v. Sipper, 137 Tex. 85, 152 S.W.2d 319, 321-322 (Tex.1941) (allegedly fraudulent deed was available for perusal by attorney of illiterate plaintiff); Houston Water-Works, 8 S.W. at 37 (cut into plaintiff's building not discoverable until walls cracked). The common thread in these cases is that when the wrong and injury were unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff, accrual of the cause of action was delayed.
To be "inherently undiscoverable", an injury need not be absolutely impossible to discover, else suit would never be filed and the question whether to apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence. Computer Associates, 918 S.W.2d at 456.
We have also considered the "objectively verifiable" element of the rule in a number of cases. In Gaddis, a patient claimed that her doctors were negligent in leaving a sponge inside her body after surgery. The presence of the sponge in her bodythe injuryand the explanation for how it got therethe wrongful actwere beyond dispute. The facts upon which liability was asserted were demonstrated by direct, physical evidence. In contrast, Robinson involved a claim by a patient against his doctors for misdiagnosis of his back condition. We summarized the issue this way:
Plaintiff, to prove his cause of action, faces the burden of proving both a mistake in professional judgment and that such mistake was negligent. Expert testimony would be required. Physical evidence generally is not available when the primary issue relevant to liability concerns correctness of past judgment. Unlike Gaddis v. Smith there exists in the present case no physical evidence which in-and-of-itself establishes the negligence of some person. What physical evidence was to the cause of action alleged in Gaddis v. Smith, expert testimony is to the cause of action in the present case. Even the fact of injury is a matter of expert testimony.
550 S.W.2d at 21. Expert testimony, we concluded, did not supply the objective verification of wrong and injury necessary for application of the discovery rule.
We have adhered to the requirement of objective verification fairly consistently in our discovery rule cases, although we have not always emphasized the requirement because the alleged injury was indisputable. Willis, 760 S.W.2d at 643 (attorney's error apparent in divorce decree); Nelson, 678 S.W.2d at 923 (child born with muscular dystrophy after doctor informed parents that mother did not carry muscular dystrophy gene); Weaver, 561 S.W.2d at 793 (negligent hemorrhoidectomy damaged nerves and muscles of plaintiff's rectum, causing loss of bowel control); Robinson, 550 S.W.2d at 21-22 (misdiagnosis of back condition not susceptible to objective verification); Hays, 488 S.W.2d at 414 (negligent vasectomy confirmed by subsequent pregnancy); International Bankers Life, 368 S.W.2d at 580 (stock transfer records and board meeting minutes proved officers' and directors' misdealing); Slay, 187 S.W.2d at 385-387 (paper trail detailed self-dealing); Ruebeck, 176 S.W.2d at 739 (improper construction and inferior underlying materials proved by examining and tearing up roof); Sherman, 152 S.W.2d at 319-321 (land title records showed defendants could not warrant good and merchantable title); Quinn, 140 S.W.2d at 438-439 (value of notes and subsequent value of property showed defendant's misrepresentations); Houston Water-Works, 8 S.W. at 37 (misconstruction of building was apparent).
*8 In the present case plaintiff R. claims that her father sexually abused her and that she unconsciously repressed all memory of it for years. If the legal injury rule were applied, R.'s claims against S. would each have accrued on the date the alleged incident of abuse occurred. In applying the statute of limitations, however, the years of her minority are not included. In effect, then, under the legal injury rule, R. is in the same position as if her claims all accrued on her eighteenth birthday and limitations began to run on that date, expiring about four months before she filed suit. R.'s claims are therefore barred unless she is entitled to an exception to the legal injury rule. R. does not allege fraud or fraudulent concealment, nor could she. R. was not deceived into thinking that she was not being abused when she was. To the contrary, R.'s contention is that she was fully aware of the episodes of abuse, so painfully so that she repressed all memory of them for years. Thus, for accrual to be deferred the discovery rule must apply. For the discovery rule to apply, R.'s claim must have been inherently undiscoverable within the limitations period and objectively verifiable.
We have twice held a fiduciary's misconduct to be inherently undiscoverable. Willis, 760 S.W.2d at 645 (attorney); Slay, 187 S.W.2d at 394 (trustee). The reason underlying both decisions is that a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so. Willis, 760 S.W.2d at 645 ("Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved."); Slay, 187 S.W.2d at 394 (knowledge of facts did not cause trust beneficiaries or co-trustees to suspect wrongdoing by other co-trustees). While a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct, so long as that relationship exists, when the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship. Because parents generally stand in the role of fiduciaries toward their minor children, see Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex. 1962), R. was not obliged to watch for misconduct by her father as long as she was a minor. Again, however, R. does not claim to have been misled.
Nevertheless, given the special relationship between parent and child, and the evidence reviewed in detail below that some traumas are by nature impossible to recall for a time, we assume without deciding that plaintiff can satisfy the inherent undiscoverability element for application of the discovery rule. We therefore focus on the second element of objective verifiability. The question is whether there can be enough objective verification of wrong and injury in childhood sexual abuse cases to warrant application of the discovery rule. To answer this question, we look first at the facts of this case and then at the general nature of such cases.

II
In reviewing a directed verdict, we examine the evidence in the light most favorable to the person suffering an adverse judgment. Henderson v. Travelers Ins. Co., 544 S.W.2d 649, 650 (Tex.1976). Here that is the plaintiff, R. If the question to be decided were whether R. raised a material fact issue that she was entitled to have the jury resolvesuch as when she knew or reasonably should have known of the claimed abusewe would limit our consideration to the evidence in her favor and discard all contrary evidence and inferences. Id. However, as our focus is on a legal issuenamely, the applicability of the discovery rule in this contextwe consider all of the evidence adduced at trial, viewing it, nevertheless, as much in R.'s favor as the record allows. From this perspective, the evidence is as follows.
S. was born in 1942. He received a B.A. degree and an M.B.A. degree, entered the U.S. Army as a commissioned officer, and served eighteen months in the medical corps in Vietnam. In March 1970, a few months after his discharge from the Army, S., then 27, married B., then 22, who had received her B.A. degree in elementary education and had just begun teaching when she met S. Neither had previously been married. Shortly after the birth of their first child, R., on October 15, 1970, S. was fired from his job, *9 and the family moved to Texas. S. and B.'s only other child, H., was born in August 1975.
While S. testified that he considered B. a good sexual partner for most of their marriage, B. testified that she felt early on that S. had become dissatisfied and that the problems were hers more than his. B. specifically recalls S.'s wanting to tie her hands while being intimate, something she particularly disliked. Though S. and B. each characterize the problems differently, it is fair to say that their sexual relationship deteriorated slowly but steadily after R. was born until it ceased altogether some three to five years before the couple separated in 1989.
B. and S.'s marriage was also adversely affected by S.'s inability to remain employed. B. felt S. was mostly to blame for being terminated from one job after another; S. attributed his misfortune to changes in his employers' businesses. B. had sufficient income to support the family from a large trust set up by her father. Eventually she provided S. an office from which he conducted a commercial real estate business. While he appears to have worked diligently at the business, he was largely unsuccessful.
S. and B. agree that after B.'s parents died in 1978 and 1979, their marriage began a steep decline. From all outward appearances, however, they seemed a model family. R. and H. were bright, well-behaved children. They attended a private girls' school. R. was at least an average student and her teachers liked her. She was a class officer in junior high school. In high school, she was awarded several prizes for citizenship, won speech contests, and was active in community service. In fact, R. graduated with over 500 hours of community service, more than any other senior at her school. Much of her work was devoted to tutoring children with learning disabilities and serving food to the homeless.
R. expressed interest in the subject of incest. She participated in an improvisational theater group for teenagers, taking part in a sketch dealing with incest. In 1988, her junior year in high school, she wrote a term paper on father-daughter Incest. Citing several books on the subject, the paper described the impact of incest on the victim daughter, the abusing father, and innocent family members. R. worked on another paper on incest her freshman year of college.
R. considered her relationship with her own father growing up as satisfactory but somewhat distant. S. was not, in her view, comfortable showing affection, and S. admits that this was true. R. recalls that S. hugged her only occasionally and never kissed her on the cheek or forehead, as a father might. She felt that when she was a little girl she could never sit in his lap and be close. He came to her school whenever parents were invited but never seemed very interested. Once, she recalls, he approached her at a school event and shook her hand, which she thought was silly. S. seemed cold to R., expressing no emotion and little or no interest. He was, she testified, "just there". H. shares essentially the same view of her father.
By contrast, R.'s relationship with her mother was very close. In college, R. came to believe that she and her mother were "enmeshed", a term R. and her counselor used to refer to an overly dependent relationship. Until she left high school, R. was very dependent on B. And B. was very protective of her daughters, watching them, she said, "like a mother hawk" and even spying on them occasionally to make sure they were all right.
R. dated several young men in high school and college. None of these relationships included sexual intercourse, but several did involve other sexual activities. She recalls being tied up during one encounter, although she does not remember whether that was her idea.
In January 1989, as R. was nearing the end of her high school senior year, S. and B. separated. B. and the girls stayed in their home, and S. moved in with his mother. In July, B. filed for divorce. R. was very angry with her parents for divorcing and sought counseling from a psychiatrist during the summer. She looked forward to getting away to college out of state, and as it turned out, she very much enjoyed her freshman year. She kept a diary in which she expressed *10 how glad she was to be making her own decisions. She again involved herself in community service and still maintained the necessary grade point average to rush and join the sorority she wanted.
At the end of her first year she returned to Dallas. On May 18, 1990, B. told R. that she, B., had been sexually abused as a child. B.'s first recollection of her own experiences had come to her a year earlier during an annual physical examination administered by her physician. She remembers that he asked her without warning, "Who sexually abused you as a child?" Instantly she recalled two instances, both involving her mother's father, that she had never before remembered. On one occasion, when she was 12 or 13 years old, her grandfather came into the kitchen partially exposed, and she picked up a knife and said, "No!", or, "Stay away!" Her grandfather did not do anything. The other incident she recalled was this:
I was beingI was tied to a wrought iron bed and I had pink shorts on, and he had pulled them down. And he was standing at the foot of the bed and he had a razor strap, a leather razor strap, and he always used a straight-edged razor, and he was sharpening the razor on the razor strap and he was just looking at me and laughing at me. He didn't do anything. He just laughed.
B. never recalled any other instances of this nature in her childhood.
Two days after B. shared these memories with R., R. wrote in her diary:
It has been very hard learning that my mother is an incest victim. It has been very interesting to watch her slowly recall some of the many things that happened to her. It is amazing how the mind is truly able to erase things like this from the mind!! In many ways I am scared to find out more.
A few weeks later R. went to see Alice Frazier, a licensed professional counselor whom B. had been seeing for some time. B. had continued to see various counselors since R.'s birth to cope with problems in her sexual relationship with S., her concerns about his inability to hold a job, weight problems, and various physical problems. R. was mainly seeking help in breaking up with her longtime boyfriend. Frazier told R. that her boyfriend was more like a father to her, saying, "Sounds like incest to me." R. also discussed other problems with Frazier, including her growing anger toward her father over the divorce. R. was concerned that her parents had not yet settled the divorce and that their financial problems were jeopardizing her returning to college. R. told Frazier that she had become aware of her first feeling of "dissociation" (a term we discuss in detail below) while talking about the divorce at a lawyer's office, where she became "very rageful at S.'s demands". R. described her extreme fear of sexual intimacy despite her interest in dating. Frazier commented in her notes that R.: "Sees some relationship with father. Very resistant to working on anything to do with S." In ten meetings with Frazier over the summer, R. never mentioned that she might have been sexually abused.
Her parents' divorce did not prevent R. from returning to college in the fall of 1990. She asked her father to drive her there, and he did. In the weeks that followed S. began to call R. at college and even sent her cards and flowers. R. found this attention very disturbing, and she asked him to stop, but he persisted. The emotional stress of the divorce and her father's attentions began to take its toll on both her studies and her social life.
Just before Thanksgiving, R. had her first image of incest. She testified that she had been napping in her room
and was kind of half asleep and half awake, and was dreaming. And I had this dream of this authoritythis man, but it was an authority figureand he didn't have a face, it was just this, it was just that authority figure over this young girl. And he was forcing himself upon her. And it wasn't all real clear, it was a dream. The girl just had kind of brownish, blondish hair, kind of long, and as I said, the man didn't have a face.
At first R. assumed the little girl was her mother, but then she began to feel what the little girl must have felt. She did not recognize *11 the faceless man at the time, and never has.
R. called Frazier and told her about the dream. Frazier suggested that they meet at Thanksgiving while R. was home. During that meeting R. told Frazier that she believed the dream had something to do with her father. Frazier had her lie on the floor, breathe deeply, and say whatever crossed her mind. Frazier refers to this as "imagery work" or free association. R. testified: "I had this, just this picture of myself and my dad and we were sitting on the edge of the bed in his room and he just had his hand on my chest, like inside my blouse. That was all."
Later the same day R. was trying to do homework when she started writing about the little girl she had seen in her first dream. The little girl was three or four years old, and her father was forcing her to touch his genitals, telling her that she was loving him and making him feel good. As she wrote, R. realized that she was the little girl and S. was the father.
A week or so later R. met with her mother and sister in Frazier's office and told them what she had recalled. B. and H. knew nothing to indicate that S. had abused R., and they found it hard to imagine, but they nevertheless believed R. Knowing the family as she did, Frazier was surprised by R.'s account of abuse, but as their discussions continued, Frazier also became convinced R. was telling the truth.
As the days passed, R. continued to recall other instances when S. had abused her. Outraged that S. was demanding visitation with H., and concerned that he would abuse her, too, R. intervened in her parents' divorce proceeding on February 19, 1991. The divorce settled several months later with S. being allowed to visit H. only when she wished, but R. persisted in her action against S.
As her memories flooded back, R. became increasingly dysfunctional. She did not return to college until January 1992 but remained at home with her mother and sister. She continued to meet with Frazier and began seeing a psychiatrist. Eventually R. recalled numerous instances when S. forced her to engage in a variety of sexual contacts. She also recalls that S.'s father fondled her.
The memories R. took longest in recalling were of the two occasions S. had intercourse with her. The first time she was at home with her family on her seventeenth birthday, in October 1987. The second time was in a motel room in August 1990, when S. had driven R. back to college for the start of her sophomore year. Although R. was nearly twenty years old at the time, and began to recall instances of abuse three months later, she had no memory of the occurrence until shortly before trial, which took place in June 1992. (R. does not include the August 1990 event in her allegations in this case. In her pleadings she specifically limited the period for which she is claiming damages to 1973-1988, and she does not seek recovery for any abuse that occurred within two years of her filing suit.)
At trial, R.'s experts explained how she could have been abused so often for so long without remembering anything until November 1990. They attributed the phenomenon to two psychological defense mechanisms dissociation and repressionwhich we discuss more fully in Part IV. As explained by the experts at trial, dissociation is the segregation of part of a person's mental process from the rest of it, so that certain ideas or experiences are removed from the main stream of consciousness. See Robert J. Campbell, Psychiatric Dictionary 211-212 (6th ed. 1989). Repression, according to the experts, is an active banning from consciousness of things that are unacceptable. See id. at 546-547. Repression blocks all memory of a traumatic event until the mind is prepared to cope with it. The experts testified that because S.'s abuse was so traumatic, she insulated herself first by being mentally "absent" while it was happening, and then by blocking all memory of it. Although the experts indicated that the distance R. felt toward her father growing up could be attributed to her unconscious awareness of his abuse, she was never actually aware of why she felt the way she did. R. is convinced that she engaged in certain sexual activities with her boyfriends because of her experiences with her father. The experts also *12 testified that R.'s study of incest in high school and college and her enjoyment in having her hands tied during a sexual encounter with her boyfriend were examples of repetition compulsionan unconscious desire to repeat what her father had done to her in a setting in which she did not fear it. Despite this acting out, the experts agreed that R. was not consciously aware of S.'s abuse until November 1990.
Frazier, the counselor who helped R. recover her memories, based her therapy on the treatment for post-traumatic stress disorder. In more than seventy sessions with R., Frazier encouraged her to recognize that her symptoms were based on a trauma, then re-experience the trauma, and then "own" the experience. Frazier considered that it was her responsibility, not to attempt to verify R.'s recollections, but to provide R. a safe place in which to remember them. Although Frazier never hypnotized R., she had her relax and recount whatever came into her head, a technique Frazier described as similar to hypnosis. Frazier also used a technique she called "guided imagery": she would read aloud memory fragments R. had written down earlier, and R. would fill in other recollections. Frazier had R. write down her dreams and then helped her interpret them. Frazier also instructed R. to write questions about her experiences with one hand and answers with the other. Switching hands, Frazier testified, helps a patient access her subconscious.
Frazier also helped R. interpret her "body memories"physical reactions to repressed experiences, such as episodes of gagging that Frazier considered to be indicative of forced oral sex. R. often saw herself as the little girl in her first dream. She described her recollection process like this:
Well, first you remember them [i.e., abusive experiences]. It's just like relive like rememberingthe child would write what happened to her, but it was like it happened to someone else. And so, there's no feelings and no emotions and no body reactions connected with it. And for me, I just then kind of put it aside and then, usually it's like three weeks to a month and a half, or, depending on the incident, three months, later that my body starts to react and go through what that little girl went through when the incident was going on.
Frazier testified that she had never known a patient to have a false memory of childhood abuse and did not believe that it happened. Two other experts who testified for R., Dr. Madigan, a psychiatrist, and Dr. Powitsky, a forensic clinical psychologist, acknowledged that patients sometimes have false memories, but they were both convinced, for several reasons, that R.'s recollections were valid. First, her symptomatology was consistent with that of other survivors of childhood sexual abuse: headaches, gastrointestinal problems, fatigue, nightmares, low self-esteem, depression, anxiety, body memories, gagging, distraction, fear of sexual intercourse, and lack of emotion in recounting memories. All three experts diagnosed R. as suffering from post-traumatic stress disorder, the symptoms of which include all-pervading fear, anxiety, depression, intrusive thoughts, memories, flashbacks, mood swings, feelings of helplessness and confusion. However, the experts admitted that all of R.'s symptoms could have been caused by something other than child abuse.
Second, the Minnesota Multiphasic Personality Inventory test administered to R. showed a classic "V" profile, shared by many survivors of sexual abuse. The experts admitted, however, that the test was not conclusive of abuse. Dr. Powitsky also noted that R. has traits of a borderline personality disorder, although she does not have that disorder. People with this disorder, he testified, are prone to distort the truth.
Third, the MMPI, administered several times to S., and his Millon Clinical Multiaxial Inventory test, showed traits similar to those in sexual offenders: narcissistic traits like self-centeredness, overvaluation of self, high need for recognition, and a high need for control; reality distortion; and problems in his ability to express emotions, especially negative ones. However, Dr. Powitsky admitted that S. did not fit other profiles of sex offenders, that the tests had some contradictory results and did not show him to be a sex abuser, and that even if S. had fit the profile *13 of a sex offender perfectly it did not mean that he had abused R. Further, one of S.'s personality tests showed no sexual deviancy, and his penile plethysmographa test for determining what subjects cause arousal in a manrevealed a "flat affect" indicating no arousal at all. On the other hand, while S. told Dr. Powitsky that he had not abused R., he also asked whether it was possible that he could have done it and not remembered.
Finally, all three experts noted the consistent, vivid details of R.'s memories. They were each convinced that R. could not have made up the events she claimed to recall. Dr. Madigan testified that R. did not appear to be the sort of person who was highly suggestible or who could be brainwashed. As Dr. Powitsky confirmed at trial, R. would "have to get an Oscar to give those details if they weren't true."
S. denies that he ever abused R. in any way, and testified specifically that he never did any of the abusive things R. had accused him of doing. Neither S. nor anyone else in the family ever used drugs, or used alcohol to excess. B. testified that she had never seen S. abuse R., and that given her strong interest in protecting her daughters, it was hard for her to imagine how S. could have done what R. claimed he did for fifteen years in their three-bedroom homes without her ever once finding out. H. stated that S. had never abused her and that she had never seen him abuse R. However, B. and H. both testified that they believed R. unequivocally.

III
R. sued S. for negligence "[d]uring the years 1973 through 1988, inclusively," in engaging or attempting to engage in sexual acts or contacts with her, and exposing himself to her while he was nude and aroused. She alleged that S.'s negligence was a breach of her right to privacy and caused her damages not in excess of $10 million. (The record does not reflect why R. alleged negligence rather than an intentional tort. One reason, presumably, would be to claim coverage under S. and B.'s homeowners' insurance policy. See Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex.1993).) As we have already explained, R.'s claims were subject to the two-year statute of limitations which did not begin to run until R.'s eighteenth birthday, October 15, 1988. R. has not complained of any occurrence after her eighteenth birthday. R.'s claims were thus barred by limitations after October 15, 1990, more than four months before she filed suit. She pleaded, however, that she was entitled to the benefit of the discovery rule.
Trial commenced to a jury. At the close of plaintiff's case, S. moved for directed verdict on two grounds: that the discovery rule did not apply and R.'s action was therefore barred by limitations as a matter of law; and that R. had failed to offer any evidence of sexual abuse. The district court granted S.'s motion without explanation and rendered judgment accordingly. The court of appeals, by a divided vote, reversed the judgment of the district court and remanded the case for further proceedings. 880 S.W.2d 804. In a brief opinion, the appeals court held that application of the discovery rule was controlled by its en banc decision two months earlier in L.C. v. A.K.D., No. 05-92-02867-CV, 1994 WL 59968, ___ S.W.2d ___ (Tex. App.Dallas Mar. 1, 1994, no writ) (en banc).
In L.C., plaintiff claimed that her father had oral sex with her in 1959, when she was two years old, and that he had intercourse with her in 1966, when she was nine. Twenty-five years later, on December 24, 1991, plaintiff filed suit against her father. She asserted that while undergoing psychological treatment in 1988 and 1989 she was asked whether she had been a victim of incest or other sexual abuse. At the time she did not think she had been, but the questions made her suspicious. In her lawsuit she alleged that she repressed all memory of the abuse until February 1, 1990. Defendant moved for summary judgment on three grounds: that the discovery rule did not apply and plaintiff's claim was barred by limitations; that even if the discovery rule applied, plaintiff knew or should have known of her claims more than two years before she filed suit; and that there is no cause of action for the acts plaintiff alleged. The district court granted summary judgment without specifying the grounds. After hearing the case en *14 banc, the court of appeals, by a vote of eight to five, reversed.
In a plurality opinion, six justices looked first to the law of other jurisdictions, both caselaw and statutes. The plurality summarized:
From our review of the law in other jurisdictions, it is clear that courts have moved more cautiously than legislatures in this area. Courts have split almost evenly on the issue now before us and, for the most part, have declined to apply the discovery rule when no suppression of memory is alleged. The presence or absence of corroborative evidence of the plaintiff's allegations has often been critical to these decisions.
Id. at *5, at ___. The plurality concluded that the "overwhelming trend" among state legislatures had been to apply the discovery rule in childhood sexual abuse cases, although it noted that in following this pattern the Oklahoma Legislature, heeding concerns expressed by its supreme court, had also required objective, verifiable evidence of both abuse and repression of memory.
Concerning Texas law, the plurality stated:
In determining whether to apply the discovery rule, Texas courts have been most concerned with (1) the presence of documentary or physical evidence to support the claim, which alleviates concerns about stale and fraudulent claims, and (2) the injustice of requiring an injured party to bring suit before discovering the injury.
Id. The plurality concluded that these two factors should be weighed against one another, and that the balance in that case favored the plaintiff. The plurality also considered that the special relationship between parent and child justified application of the discovery rule.
The plurality added, however, that it was "mindful of the tremendous evidentiary problems presented by claims based on events that occurred decades ago in which there may be no physical evidence of the abuse." Id. Consequently, the plurality held "that as a prerequisite to application of the discovery rule, a plaintiff must present objective evidence of the fact of the abuse and resultant, continuous suppression of memory of the abuse until discovery." Id. The plurality concluded that the necessary objective evidence was supplied by the expert testimony of plaintiff's psychiatrist describing the symptoms of childhood sexual abuse and resultant memory repression, describing plaintiff's therapy through which her memory emerged, diagnosing plaintiff as suffering from post-traumatic stress disorder, and explaining the general symptoms and memory repression associated with PTSD. Id. at *5-*6, at ___ _ ___.
Two justices concurred in the plurality's conclusion that the discovery rule should apply but disagreed that plaintiff should be required to produce objective evidence of abuse and repression in response to a motion for summary judgment. The concurring justices also disagreed that a psychiatrist's opinion could qualify as objective evidence. The concurring opinion is not clear on whether plaintiff should be required to adduce objective evidence of abuse and repression at trial. Id. at *7, at ___ (Maloney, J., concurring). Five justices dissented, arguing that this Court's decision in Robinson rejected expert testimony as sufficient evidence of wrong and injury to justify application of the discovery rule. These dissenters concluded that absent physical evidence of abuse plaintiff's claim was too uncertain to avoid the bar of limitations. Id. at *9-*10 at ___ _ ___ (Barber, J., dissenting). One of the dissenting justices also joined in the concurring justices' views that plaintiff's burden to avoid summary judgment should not be increased, and that a psychiatrist's testimony is not objective evidence. Id. at *8 at ___ (Kinkeade, J., dissenting).
The decision of the court of appeals is not entirely clear from its opinions. Eight of the thirteen justices would apply the discovery rule in childhood sexual abuse cases. It appears, however, that ten justices would require objective evidence of abuse before applying the discovery rule, and that seven would not recognize expert testimony as objective evidence.
The balancing test formulated by the court of appeals pluralityweighing the availability of objective evidence against the injustice *15 of requiring that suit be filed before injury is discovereddoes not correctly state Texas law. As we have already noted, for the discovery rule to apply a plaintiff's claim must be inherently undiscoverable and objectively verifiable. The concern that meritorious claims will be barred is already taken into account in fashioning these two elements. The two elements strike the proper balance between the beneficial purposes of statutes of limitations and the real concern that a person's rights may be cut off. To reweigh this concern, which is of course a legitimate one, against the very balance it has produced would be to make it the determinative factor. As we stated in Robinson, the "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute. The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind." 550 S.W.2d at 20. Allowing late-filed claims that are inherently undiscoverable while requiring objectively verifiable injury reduces the likelihood of injustice in cutting off valid claims while affording some protection against stale and fraudulent claims.
The only physical evidence to support R.'s allegations consists of her symptoms and to a lesser extent her behavioral traits, as described by her and the experts who testified on her behalf. In every instance this evidence was inconclusive. The experts testified that R.'s symptoms could have been caused by other things than sexual abuse by her father. While R. fit a behavioral profile for someone who has been sexually abused, the experts acknowledged that that did not mean she had actually been abused. Tests on S. were also inconclusive. While he had many of the characteristics of a sex abuser, he did not match a characteristic profile, and even if he had, it would not prove that he abused R. Thus, there is no physical or other evidence in this case to satisfy the element of objective verifiability for application of the discovery rule.
The kinds of evidence that would suffice would be a confession by the abuser, e.g. Meiers-Post v. Schafer, 170 Mich.App. 174, 427 N.W.2d 606, 610 (1988); a criminal conviction, e.g. Petersen v. Bruen, 106 Nev. 271, 792 P.2d 18, 24-25 (1990); contemporaneous records or written statements of the abuser such as diaries or letters; medical records of the person abused showing contemporaneous physical injury resulting from the abuse; photographs or recordings of the abuse; an objective eyewitness's account; and the like. Such evidence would provide sufficient objective verification of abuse, even if it occurred years before suit was brought, to warrant application of the discovery rule.
Although we indicated in Robinson that expert testimony would not alone provide the objective verification of a claim necessary to invoke the discovery rule, we have not held that such testimony can never suffice, at least in connection with other evidence, such as the symptoms of a survivor of abuse. We have held only that the bar of limitations cannot be lowered for no other reason than a swearing match between parties over facts and between experts over opinions. It is quite possible that recognized expert opinion on a particular subject would be so near consensus that, in conjunction with objective evidence not based entirely on the plaintiff's assertions, it could provide the kind of verification required. That is not true in this case, but we must explain why.

IV
Dr. Madigan, a psychiatrist who examined R. and testified at trial on her behalf, stated that psychiatry is not an exact science. Recognizing the reality of false claims of sexual abuse and the danger they pose to innocent people, Dr. Madigan told the jury: "I think it's a tremendous burden for everybody in this room to figure it out."
Dr. Madigan accurately characterized the problems of trying to determine whether childhood sexual abuse has occurred when the victim has repressed all memory of it for a long period of time. The scientific literature on memory in general and recovered memory in particular establishes the wealth of uncertainty about these subjects. There is some agreement among psychiatrists concerning psychiatric treatment in this area. See American Psychiatric Ass'n, Statement on Memories of Sexual Abuse (1993), reprinted in 42 Int'l J. Clinical & Experimental *16 Hypnosis 261 (1994) [hereinafter Memories of Sexual Abuse]. But there is little agreement on the validity of recovered memories or on the techniques used to retrieve them.
Researchers and therapists view the question of repressed memory from disparate vantage points, and with strong disagreements about the phenomena. E.g., John G. Watkins, Dealing with the Problem of "False Memory" in Clinic and Court, 21 J. PSYCHIATRY & L. 297 (1993). The schism between the controlled world of the laboratory and the working theories of practice demonstrates that science has simply not evolved to the point that it can give definite guidance in determining whether childhood sexual abuse has occurred in a particular instance.
There is basic agreement about the workings of the memory process. The senses register an event; these sense images are organized into meaningful units; the organized images are stored or "encoded" in the brain's neural structure; and finally, memories are retrieved and recounted. See MEMORIES OF SEXUAL ABUSE, supra, at 261-262; MICHAEL D. YAPKO, SUGGESTIONS OF ABUSE: TRUE AND FALSE MEMORIES of Childhood Sexual Abuse 66-71 (1994); Australian Psychological Soc'y, Bd. of Directors, Guidelines Relating to the Reporting of Recovered Memories § C.I. (1994) [hereinafter Reporting of Recovered Memories]; Elizabeth Loftus & Katherine Ketcham, The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse 75 (1994). See also Roberta L. Klatzky, Human Memory: Structure and Processes 2-9 (2d ed. 1980). People commonly recall little from the first five to seven years of life, and very infrequently anything before the age of two or three, principally because the brain has not matured sufficiently to assimilate and carry forward meaningful memories. E.g. Yapko, supra, at 77. See also Donald P. Spence, Narrative Truth and Putative Child Abuse, 42 Int'l J. Clinical & Experimental Hypnosis 289, 293-295 (1994).
Explicit, or declarative, memory refers to the ability to consciously recall events or facts. Memories of Sexual Abuse, supra, at 262. Implicit, or procedural, memory is behavioral knowledge of an experience without conscious recall. Examples of the latter are knowing how to ride a bicycle and a combat veteran's feeling of panic upon hearing helicopters without remembering specifically the helicopter crash that killed a friend. Id. These two types of memory appear to be supported by different brain systems. Id. Some have posited that procedural memory may remain after declarative memory of the event that generated it has vanished. See Matthew H. Erdleyi, Repression, Reconstruction, and Defense: History and Integration of the Psychoanalytic and Experimental Frameworks, in Repression and Dissociation: Implications for Personality Theory, Psychopathology, and Health, 1, 16 (Jerome L. Singer ed. 1990) [hereinafter Repression and Dissociation]. Procedural memory could therefore play a role in tending to confirm or belie an accusation of abuse. The problem, of course, is that a certain type of procedural memory, like gagging, may indicate child abuse, but the fact that a person gags does not indicate why; it does not eliminate all other possible causes except abuse. Thus, procedural memories may be misinterpreted by a patient or therapist, and that misinterpretation may solidify into "truth".
Memory is a multifarious, complex, usually reconstructive process. It does not retrieve information the way a video recorder or computer does. Everything sensed is not stored; recall of picture-perfect images is not automatic. A variety of social, psychological, and developmental factors commonly cause distortions at each stage of the process. Memories of Sexual Abuse, supra, at 262-263; LOFTUS & KETCHAM, supra, at 3-5, 73-101; see also, e.g., Maryanne Garry & Elizabeth Loftus, Pseudomemories Without Hypnosis, 42 Int'l J. Clinical & Experimental Hypnosis 363 (1994). The real possibility of such distortions cannot be overlooked or minimized in determining what relation recalled memories bear to what really happened. See generally Richard J. Ofshe & Margaret T. Singer, Recovered-Memory Therapy and Robust Repression: Influence and Pseudomemories, 42 Int'l J. Clinical & Experimental Hypnosis 391, 397-398, 404-405 (1994).
*17 Repression is the term used to describe unconscious forgetting of events that cause the individual pain. E.g., Campbell, supra, at 181-182; David S. Holmes, The Evidence for Repression: An Examination of Sixty Years of Research, in Repression and Dissociation 85, 85-86 (Jerome L. Singer ed. 1990); Elizabeth Loftus & Katherine Ketcham, The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse 49-56 (1994). The terms "repression" and "dissociation", however, have variable meanings, and different scholars and therapists may use them differently. Id.; George E. Vaillant, Repression in College Men Followed for Half a Century, in Repression and Dissociation: Implications for Personality Theory, Psychopathology, and Health 259, 259-260 (Jerome L. Singer ed. 1990). There is overwhelming consensus that repression exists. It differs from "simple forgetting", but there is debate in the scientific community about the extent to which amnesia stems from repression or simple forgetting. See Erdelyi, supra, at 5-6. A number of theorists distinguish repression from suppression, which is the conscious forgetting of unpleasant thoughts or emotions. E.g. Vaillant, supra, at 262. With unconscious repression, a plaintiff may be said to be "blamelessly ignorant" of her amnesia. See generally Camille W. Cook & Pamela Kirkwood Millsaps, Redressing Wrongs of the Blamelessly Ignorant Survivor of Incest, 26 U. Richmond L.R. 1, 5 n. 20 (1991) (attributing the phrase to Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949)). On the other hand, a plaintiff who consciously suppresses memories of an event might not be as "ignorant".
Some therapists believe that repressed material can be restored to consciousness if the anxiety associated with the memory is removed. See Yapko, supra, at 52-53, 84-87; Holmes, supra, in Repression and Dissociation at 86. This belief, of course, assumes that the material has not been "simply forgotten" or confabulated. In addition, since recalling is a constructive process, a host of defense mechanisms may distort images or feelings at that phase as well. Erdelyi, supra, at 22-26; Memories of Sexual Abuse, supra, at 263-264. One nineteenth-century psychologist cautioned of the dangers inherent in recall of partial memories:
Total forgetfulness is not serious; but partial forgetfulness is treacherous.... [W]e are liable to fill in from our imagination and disjointed fragments furnished by memory.... We unwittingly become creative artists....
P. JESSEN, VERSUCH EINER WISSENSCHAFTLICHEN BEGRUNDUNG DER PSYCHOLOGIE (1855) (Hugh A. Erdelyi trans), quoted in Erdelyi, supra, at 20-21.
Because the second requirement for applying the discovery rule is an objectively verifiable wrong, the central determination that must be made is whether recovered memories meet this requirement. The question whether recovered memories are valid has elicited the most passionate debate among scholars and practitioners, and the consensus of professional organizations reviewing the debate is that there is no consensus on the truth or falsity of these memories. American Medical Ass'n, Council on Scientific Affairs, Report on Memories of Childhood Abuse 3:43-45 (1994), reprinted in 43 Int'l J. Clinical & Experimental Hypnosis 114, 116 (1995) [hereinafter Childhood Abuse] ("In short, empirical evidence can be cited for both sides of the argument. While virtually all would agree that memories are malleable and not necessarily fully accurate, there is no consensus about the extent or sources of this malleability. The issue is far from settled...."); Memories of Sexual Abuse, supra, at 262 ("It is not known how to distinguish, with complete accuracy, memories based on true events from those derived from other sources."); id. at 263 ("It is not known what proportion of adults who report memories of sexual abuse were actually abused.... [T]here is no completely accurate way of determining the validity of reports in the absence of corroborating information."); Reporting of Recovered Memories, supra, § C.I. ("The available scientific and clinical evidence does not allow accurate, inaccurate, and fabricated memories to be distinguished in the absence of independent corroboration.").
*18 Recovered memories come to be regarded as true for a variety of reasons. Therapists who expect to find abuse often do. And because the therapist occupies a position of authority and trust with the patient, this "confirmatory bias" can lead to leading questions and other forms of suggestion. E.g., Yapko, supra at 45, 60 & 86 (19% of therapists surveyed knew of cases where it was highly likely that a victim's trauma was somehow suggested by the therapist instead of by genuine experience). Some therapists may jump to conclusions and may fail to explore other causes for the memories. E.g., Reporting of Recovered Memories, supra, § C.II; Loftus & Ketcham, supra, at 266; Spence, supra, at 295-296. Therapists also may interpret certain symptoms as indicating childhood sexual abuse, but those symptoms may be so general that they do not eliminate other possible ills.
In short, the preconceptions of the therapist, the suggestibility of the patient, the aleatory nature of memory recall, and the need to find a clear culprit for a diffuse set of symptoms may lead to false memories. Or they may not. Even assuming the reliability of all the studies and reports on the theory and techniques underlying recovered memory, the possibility of confabulation still exists. But it does not always occur. The point is this: the scientific community has not reached consensus on how to gauge the truth or falsity of "recovered" memories. E.g., Memories of Sexual Abuse, supra, at 263 ("While aspects of the alleged abuse situation, as well as the context in which the memories emerge, can contribute to the assessment, there is no completely accurate way of determining the validity of reports in the absence of corroborating information.") To rely on memories alone for objective verification of abuse, this gauge is necessary. For purposes of applying the discovery rule, expert testimony on subjects about which there is no settled scientific viewindeed, not even a majority scientific viewcannot provide objective verification of abuse.
Professional organizations have recognized that the danger of confabulated memories is substantial enough to caution therapists of the danger of facilitating their creation. REPORTING OF RECOVERED MEMORIES, supra, § C.II; MEMORIES OF SEXUAL ABUSE, supra, at 263-264; CHILDHOOD ABUSE, supra, at 4 ("The AMA considers recovered memories of childhood sexual abuse to be of uncertain authenticity, which should be subject to external verification."). These organizations have also asked therapists to recognize a difference between the truth that emerges from therapy and the truth that obtains in a court of law. Reporting of Recovered Memories, supra, § C.II.
The expert testimony in this case, from qualified, competent therapists, shows the pitfalls of recalled memory therapy and the difficulties in using the results of such therapy as objective verification of abuse. Before she entered therapy, R. had no memories of abuse. She recovered her memories with Frazier, a licensed therapist who was not a specialist in memory. Some of Frazier's views may have influenced R.: Frazier had never had a patient make an untrue allegation of childhood sexual abuse, did not know of an instance when anyone had made such an untrue allegation, and did not think it could happen; she felt it was not her role to question the veracity of R.'s memories; she accepted the idea that R. could recover memories from around age three; and she had already found that R.'s mother had been the victim of childhood sexual abuse. The American Psychiatric Association has recognized clinicians' need to guard against their own possible preconceptions:
Psychiatrists should maintain an empathic, non-judgmental, neutral stance towards reported memories of sexual abuse.... [C]are must be taken to avoid prejudging the cause of the patient's difficulties, or the veracity of the patient's reports. A strong prior belief by the psychiatrist that sexual abuse, or other factors, are or are not the cause of the patient's problems is likely to interfere with appropriate assessment and treatment.
MEMORIES OF SEXUAL ABUSE, supra, at 263.
In addition to Frazier's possible confirmatory bias, her technique to recover memories may have increased R.'s suggestibility. Frazier had R. relax and recount whatever came into her head, a technique she described as *19 similar to hypnosis. She also used what she called "guided imagery", reading aloud fragments R. had written down earlier and having R. fill in other recollections. Both hypnosis and guided, leading questioning have been criticized as oversuggestive. E.g. Yapko, supra, at 96-98. See also Loftus & Ketcham, supra, at 73-101; Maryanne Garry & Elizabeth Loftus, Pseudomemories Without Hypnosis, 42 Int'l J. Clinical & Experimental Hypnosis 363 (1994). Frazier's interpretation of various events may have also stemmed from a "confirmation bias". R.'s first dream involved a faceless man; this man never got a face. R.'s procedural memory, gagging, did not of itself point to having been forced to perform oral sex. The record does not show that other possible causes were sufficiently explored. Other possible influences on or sources of R.'s recovered memories include: B.'s detailing of her own abuse, R.'s research on incest, her anger with her father, and Frazier's comment that R.'s relationship with a boyfriend "sounded like incest" to her.
We do not mean to discount Frazier's testimony. It may be that her treatment and diagnosis of R. were flawless. Certainly, there is much scientific evidence, both in the record of this case and in psychological literature, to support R.'s position. Three experts, two of whom at least were initially neutral about or skeptical of her stories, concluded without doubt that she was telling the truth. Her physical symptoms, while not proof positive of abuse, were at least consistent with it. Yet they were equally consistent with other causes. Had R. brought suit against S. before she turned twenty, the conflict in the evidence would be for the jury to resolve. Because she did not, however, and because she thus relies on the discovery rule, the evidence must rise to a higher level of certainty. The point is, the area of science in which the experts at trial work can at present neither confirm nor negate their opinions. Two of the experts who testified for R. acknowledged this fact.
In addition, post-traumatic stress disorder, from which R. suffered, presupposes "an event outside the range of usual human experience that would be markedly distressing to almost anyone." American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders [hereinafter Manual of Mental Disorders] § 309.81, at 424-429 (4th Ed.1994). Obviously, a PTSD diagnosis cannot establish the occurrence of a trauma that it presupposes. Even if a diagnosis of PTSD were some indication that a trauma occurred, it could not indicate what kind of trauma occurred, and more importantly, who caused it. See generally Alan A. Stone, Post-Traumatic Stress Disorder and the Law: Critical Review of the New Frontier, 21 Bull.Am.Acad.Psychiatry & L. 23 (1993). PTSD's paradoxical symptomatology cannot provide objective verification of an injury because its symptoms include both avoidance behavior (active or unconscious repression of memories) and re-experiencing criteria (flashbacks). See Manual of Mental Disorders, supra, § 309.81, at 424-425, 428. Thus, the PTSD diagnosis of itself indicates that a patient could suffer from both too much and not enough memory of a trauma. The editors of the Manual of Mental Disorders caution that when its criteria, categories, and textual descriptions are used for forensic purposes, they carry significant risks of misuse or misunderstanding: "These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis." Id. at xxiii. As to the more specific use of trying to attribute a certain disorder to a specific cause, the Manual of Mental Disorders advises: "Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments. Inclusion of a disorder in the Classification (as in medicine generally) does not require that there be knowledge about its etiology." Id.
In sum, the literature on repression and recovered memory syndrome establishes that fundamental theoretical and practical issues remain to be resolved. These issues include the extent to which experimental psychological theories of amnesia apply to psychotherapy, the effect of repression on memory, the effect of screening devices in recall, the effect of suggestibility, the difference *20 between forensic and therapeutic truth, and the extent to which memory restoration techniques lead to credible memories or confabulations. Opinions in this area simply cannot meet the "objective verifiability" element for extending the discovery rule.

V
As the court of appeals observed in L.C., other states are divided over whether to apply the discovery rule in childhood sexual abuse cases. The caselaw of other jurisdictions is a confusing patchwork that does not seem to indicate any overwhelming trend.
Some courts have applied the rule when plaintiff alleges repression of the memory of abuse or resulting injury. See Farris v. Compton, 652 A.2d 49, 63-64 (D.C.1994); Callahan v. State, 464 N.W.2d 268, 273 (Iowa 1990); McCollum v. D'Arcy, 138 N.H. 285, 638 A.2d 797, 799-800 (1994); Osland v. Osland, 442 N.W.2d 907, 909 (N.D.1989); Ault v. Jasko, 70 Ohio St.3d 114, 637 N.E.2d 870, 873 (1994); Olsen v. Hooley, 865 P.2d 1345, 1349-1350 (Utah 1993); Simmons v. United States, 805 F.2d 1363, 1368 (9th Cir.1986) (applying federal law); Ulibarri v. Gerstenberger, 178 Ariz. 151, 871 P.2d 698, 705 (Ct. App.1993); Mary D. v. John D., 264 Cal. Rptr. 633, 639 (Ct.App.1989), review dism'd, 275 Cal.Rptr. 380, 800 P.2d 858 (1990); Phillips v. Johnson, 231 Ill.App.3d 890, 174 Ill. Dec. 458, 461, 599 N.E.2d 4, 7 (1992); Franke v. Geyer, 209 Ill.App.3d 1009, 154 Ill.Dec. 710, 712, 568 N.E.2d 931, 933 (1991); Hammer v. Hammer, 142 Wis.2d 257, 418 N.W.2d 23, 25-26 (Ct.App.1987), review denied, 144 Wis.2d 953, 428 N.W.2d 552 (1988); Johnson v. Johnson, 701 F.Supp. 1363, 1370 (N.D.Ill. 1988) (applying Illinois law).
A few states have refused to apply the discovery rule when the plaintiff did not repress memories of the abuse when it occurred, but did not realize that the abuse was injurious, or did not appreciate the extent of injury, or could not take action because of the psychological effects of the abuse, or simply waited. See E.W. v. D.C.H., 231 Mont. 481, 754 P.2d 817, 819-820 (1988) (superseded by statute as noted in Cosgriffe v. Cosgriffe, 262 Mont. 175, 864 P.2d 776, 780 (1993); Lovelace v. Keohane, 831 P.2d 624, 632 (Okla.1992); Doe v. R.D., 308 S.C. 139, 417 S.E.2d 541, 542 (1992); O'Neal v. Division of Family Servs., 821 P.2d 1139, 1145 (Utah 1991); Cassidy v. Smith, 817 P.2d 555, 558 (Colo.Ct.App.1991); Franke v. Geyer, 209 Ill.App.3d 1009, 154 Ill.Dec. 710, 712, 568 N.E.2d 931, 933 (1991); E.J.M. v. Archdiocese of Philadelphia, 424 Pa.Super. 449, 622 A.2d 1388, 1394 (1993); Schmidt v. Bishop, 779 F.Supp. 321, 330 (S.D.N.Y.1991) (applying New York law).
Some courts have refused to apply the discovery rule even if the plaintiff repressed all memory of the event. See Lemmerman v. Fealk, 449 Mich. 56, 534 N.W.2d 695, 703 (1995); Shippen v. Parrott, 506 N.W.2d 82, 85-86 (S.D.1993) (legislation prohibits discovery rule); Tyson v. Tyson, 107 Wash.2d 72, 727 P.2d 226, 230 (1986) (partially superseded by statute as stated in North Coast Air Servs., Ltd. v. Grumman Corp., 111 Wash.2d 315, 759 P.2d 405, 409 (1988)); Lindabury v. Lindabury, 552 So.2d 1117, 1118 (Fla.Dist. Ct.App.1989) (per curiam), cause dism'd as untimely filed, 560 So.2d 233 (Fla.1990); Baily v. Lewis, 763 F.Supp. 802, 810 (E.D.Pa.) (applying Pennsylvania law), aff'd, 950 F.2d 721 (3d Cir.1991).
Compounding the difficulty of ascertaining any convincing trend in the caselaw is the effect of statutes. At the time many of these cases were pending, state legislatures had already enacted legislative discovery rules specifically covering childhood sexual abuse cases. Callahan, 464 N.W.2d at 272; Olsen, 865 P.2d at 1348 n. 2 (woman filing before statute's effective date claimed sexual abuse by adoptive father and sibling had memories triggered by adoptive brother's admission to mental institution for abusing his own daughter; held discovery rule delays accrual but requiring plaintiff on remand to corroborate allegations of abuse with, for example, contemporaneous physical manifestations of the abuse or evidence that a defendant committed similar acts against others); D.P. v. M.J.O., 266 Ill.App.3d 1029, 203 Ill.Dec. 950, 953-955, 640 N.E.2d 1323, 1326-1328 (1994); Phillips, 174 Ill.Dec. at 461, 599 N.E.2d at 7. Legislative enactments have been taken to be strong evidence of the public policy of the forum. See Callahan, 464 N.W.2d at 272 *21 ("Iowa Code § 614.8A [implementing the discovery rule] is not involved in this case, but it evidences a strong public policy that, we believe, is relevant in determining whether adoption of the discovery rule is compatible with other legislation such as [the Iowa tort claims statute]."); see also Shippen, 506 N.W.2d at 85 (refusing to apply the discovery rule because the legislature had considered and rejected it). We also note that several state court rulings on the discovery rule have been superseded by statutes. E.g., E.W., 754 P.2d at 819-820 (superseded by statute as noted in Cosgriffe, 864 P.2d at 780; Tyson, 727 P.2d at 230 (partially superseded by statute as stated in North Coast Air Servs., 759 P.2d at 409).
In sum, any trend in state caselaw is simply too small, contradictory and intermixed with legislative initiative to provide clear guidance as to the rule a court should adopt.
Legislatures have been far more active than courts in addressing the problem. Though fewer than fifteen state supreme courts have addressed the problem of limitations and childhood sexual abuse, since the mid-1980s, over half of the state legislatures have enacted or amended statutes of limitations to specifically address the problem of childhood sexual abuse claims. See Alaska Stat. § 09.10.140 (1994); Ark.Code Ann. § 16-56-130 (Michie Supp.1995); Cal.Civ. Proc.Code § 340.1 (West Supp.1996); Colo. Rev.Stat.Ann. § 13-80-103.7 (West Supp. 1995); Conn.Gen.Stat.Ann. § 52-577d (West 1991); Ga.Code Ann. § 9-3-33.1 (Michie Supp.1995); Ill.Ann.Stat. ch. 735, para. 513-202.2 (Smith-Hurd 1992); Iowa Code Ann. § 614.8A (West Supp.1995); Kan.Stat.Ann. § 60-523 (1994); Me.Rev.Stat.Ann. tit. 14, § 752-C (West Supp.1995); Mass.Gen.Law Ann. ch. 260, § 4C (West Supp.1995); Minn. Stat.Ann. § 541.073 (West Supp.1996); Mo. Ann.Stat. § 537.046 (Vernon Supp.1996); Mont.Code Ann. § 27-2-216 (1995); Nev. Rev.Stat. § 11.215 (1993); N.J.Stat.Ann. 2A:61B-1 (West Supp.1995); N.M.Stat.Ann. § 37-1-30, as amended by Act of Apr. 5, 1995, 1995 N.M.Laws 626; Okla.Stat.Ann. tit. 12, § 95 (West Supp.1996); Or.Rev.Stat. § 12.117 (1995); R.I.Gen.Laws § 9-1-51 (Michie Supp.1995); S.D.Codified Laws § 26-10-25 (1992); Utah Code Ann. § 78-12-25.1 (Michie Supp.1995); Vt.Stat.Ann. tit. 12, § 522 (Michie Supp.1995); Va.Code Ann. § 8.01-249 (Michie Supp.1995); Wash.Rev. Code Ann. § 4.16.340 (West Supp.1996); Wyo.Stat. § 1-3-105(b) (Michie Supp.1995).
Statutory solutions have not always consisted of merely adopting the discovery rule. Essentially, there are two generations of statutes addressing the problem of delayed accrual for childhood sexual abuse cases. The first generation simply adopted the discovery rule or extended the statute of limitations for some fixed, extended period after the minor reached majority. E.g. Alaska Stat. § 09.10.140 (three years after discovery); Ga.Code Ann. § 9-3-33.1 (five years after majority). The second generation of statutes, including amendments to existing statutes, is more complex and gives greater weight to avoiding the danger of possibly fraudulent claims. For example, in 1986 the California Legislature adopted the discovery rule for childhood sexual abuse. Later amendments to the statute require "certificates of merit" for plaintiffs 26 years or older. These certificates of merit must be executed by the plaintiff's attorney and a licensed mental health practitioner. The attorney must state that he has reviewed the facts of the case with at least one licensed mental health practitioner, who is not a party to the litigation, and that on the basis of this review and consultation, there is reasonable and meritorious cause to file the action. Cal. Civ.Proc.Code § 340.1(e)(1). The mental health practitioner must state that he is licensed in California, is not treating or has not treated the plaintiff, has interviewed the plaintiff, and on the basis of that interview has concluded the plaintiff was subject to childhood sexual abuse. Later amendments to California's Section 340.1 require greater protection of the defendant's identity. Cal. Civ.Proc.Code § 340.1(k)(1) (West Supp. 1996). In the same vein, Colorado's statute, amended in 1993, requires that persons who claim psychological inability to acknowledge the abuse must prove both the disability and that the harm occurred. Colo.Rev.Stat.Ann. § 13-80-103.7; see also N.M.Stat.Ann. § 37-1-30(A)(2) (claim must be corroborated by "competent medical or psychological testimony"); *22 OKLA.STAT.ANN. tit. 12, § 95(6) (requiring "objective verifiable evidence [that] should include both proof that the victim had psychologically repressed the memory of the facts upon which that claim was predicated and that there was corroborating evidence that the sexual abuse ... actually occurred").
This newly-emerging complexity of legislation indicates that categorically adopting or rejecting the discovery rule does not address the welter of public policies surrounding late-filed childhood sexual abuse claims. The second generation of statutes shows that legislatures do not uniformly see simple adoption of the discovery rule in such cases as viable. Legislatures have begun to strike a more complex balance between the risk of cutting off meritorious claims and the dangers of fraudulent claims.
The Texas Legislature entered this area just last year, enacting a special statute of limitations for civil actions for sexual abuse which extends the period for filing suit from two years to five years. However, the new limitations period, like the old one, begins on the day the cause of action accrues. The Legislature did not define accrual for purposes of the new statute, although it certainly could have done so, just as it could have chosen a different starting date altogether. It could also have prescribed application of the discovery rule as it has done in other statutes. E.g., Tex.Bus. & Com.Code § 17.565 ("All actions brought under [the Deceptive Trade PracticesConsumer Protection Act, id. §§ 17.41-.63] must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.") It did not do so, just as it has not done so in criminal sexual abuse cases. Tex.Code Crim.Proc. arts. 12.01(2)(D) & 12.03 (criminal action must be brought within ten years from the date of the commission of the offense). We must assume that the Legislature did not intend for sexual abuse cases to be treated differently from any other case in applying the discovery rule. The Legislature is in the best position to determine and accommodate the complex and conflicting policies involved in determining an appropriate limitations period, and it has done so.

VI
We are constrained to respond briefly to the dissenting opinion and the concurring opinions.

A
The dissent opens declaring, "There are no simple answers", post at 28, and then proceeds to suggest one: the discovery rule should be applied whenever there is "direct testimony from the victim, supported by the opinions of reputable, experienced specialists that [the victim] has been sexually abused and that she exhibits traits and behavior associated with sexual abuse." Post at 37. In other words, no claim of sexual abuse should be barred by limitations as long as a competent expert thinks it may have merit. Were this the rule, few claims of sexual abuse would ever be barred by limitations. The claim in L.C. would not be barred, even though plaintiff filed suit when she was 34 years old, 25 years after the last alleged occurrence of abuse. Claims in divorce cases, like the one in the present case, would never be barred, adding to the acrimony in such cases. The dissent is "concerned that statutes of limitations ... have been steadily eroded by doctrines such as ... the discovery rule", post at 40, but nevertheless advocates a rule that would practically exempt sexual abuse claims from any statute of limitations. As the dissent states, "if `repressed' memory can support a verdict in a suit brought before the victim reaches the age of twenty, there is no basis for denying the applicability of the discovery rule in cases where repressed memory is recalled after the age of twenty." No basis, ever. Post at 29.
In the dissent's view, the traditional purposes served by limitations do not reach sexual abuse cases. Repose would be an injustice:
I am not persuaded, however, that the defendant's interest in repose should carry the day in the context of childhood sexual *23 abuse because of the degree of culpability associated with the defendant's actions, because it is the defendant's actions that have led to the delay, and because of the lifelong effects of abuse on the victim.
Post at 33. This, of course, assumes that all defendants are guilty. Some are not. Limitations always bars some valid claims, but this is the price of repose. If limitations applied only to claims which cannot be proved, it would serve no purpose at all. The danger of stale or fraudulent claims is also unimportant for the dissent because "the evidence in childhood sexual abuse cases often will not be `fresh' even if the case is brought within the statutory period." Post at 33. The dissent sees no significant difference in evidence a few years old and evidence a few decades old.
If the same rule the dissent urges were extended to other types of claims, as it surely should be unless there is some reason to limit its application, the principles that support statutes of limitations would be significantly impaired. It is clear, however, that the dissent has no such intention. In Computer Associates, also decided today, the dissenting Justice agrees that the discovery rule should not apply in trade secret cases. This suggests that the dissent contemplates a special limitations jurisprudence unique to sexual abuse cases.
The dissent contends that its conclusion is compelled by decisions of this Court with which it does not agree but which it must nevertheless follow. Post at 32. We do not read the cases cited to provide support to the dissent's argument. Willis v. Maverick, 760 S.W.2d at 642, which we have discussed above, did apply the discovery rule in a legal malpractice case, but that case met both discovery rule standards of inherent undiscoverability and objective verifiability. The Court did not find the reasoning of Robinson convincing in the circumstances presented in Willis, but it certainly did not disapprove or overrule Robinson.
While we recognize that language in some of our opinions can be read to justify use of the discovery rule in a broad range of circumstances, none of our cases requires such a result. The discovery rule is an exception, and a narrow one at that. We do not agree with the dissent that past inconsistencies doom us to perpetual inconsistency. In this case and in Computer Associates we have attempted to formulate a principle for applying the discovery rule that will make future decisions more consistent. The dissent argues that the two elements we have identified for applying the discovery rule should not be "a hard and fast rule", and that "other factors" should be considered. Post at 32. Yet the dissent makes no effort to identify these factors or formulate a discovery rule that incorporates them.
In essence, the dissent's position is that if there are to be any exceptions to the legal injury rule, sexual abuse cases must be among them. But sexual abuse cases are subject to the same rules that apply in other cases. We have used the discovery rule in cases alleging a breach of fiduciary duty, but as in other discovery rule cases the injury must be objectively verifiable. Willis, 760 S.W.2d at 643 (attorney's error apparent in divorce decree); Slay, 187 S.W.2d at 385-387 (paper trail detailed self-dealing). R.'s father owed her a fiduciary duty, see Thigpen v. Locke, 363 S.W.2d at 253, at least as long as she remained a minor, and because of that relationship S.'s abuse may have been inherently undiscoverable. The dissent states: "The Court agrees that S. owed a fiduciary duty to R., but concludes that this is immaterial since she was not `misled'. Post at 34. We conclude no such thing. The discovery rule does not apply in this case, not because R. was not misled, but because she cannot satisfy the objective verifiability element of the rule.
The dissent argues that "policy reasons" warrant use of the discovery rule in this case, just as in Sanchez v. Hastings, 898 S.W.2d 287 (Tex.1995) (per curiam). Sanchez did not involve application of the discovery rule at all; rather, the issue there, as the dissent notes, was whether the running of limitations should be tolled. In Sanchez, as in Hughes v. Mahaney & Higgins, 821 S.W.2d 154, 157 (Tex.1991), we held that limitations on a claim of legal malpractice in the conduct of litigation is tolled until the litigation is finished "based in part on the policy that a *24 client should not be forced to take inconsistent positions." Sanchez, 898 S.W.2d at 288. There was no argument the claim accrued at any time other than when legal injury occurred. The "policy" referred to was not simply an expression of judicial preference but a recognition of the practical impossibility of requiring a client to argue in one proceeding that his attorney acted properly and in a contemporaneous proceeding that his attorney was negligent. The legal policies underlying the discovery rule are encompassed in the principle requiring that a claim be inherently undiscoverable and objectively verifiable. By contrast, the amorphous "policy reasons" invoked by the dissent do not appear to be grounded in anything other than one judge's personal views.
The dissent argues that the Court should not require objective verifiability of the injury in this case because it does not impose the same requirement in cases of fraud and fraudulent concealment. While the injuries in the two cases the dissent cites, Borderlon, 661 S.W.2d at 908 (surgical needle left in patient's intestines later removed), and Kelley, 532 S.W.2d at 949 (false credit report), plainly met the objectively verifiable requirement, we need not decide here whether that requirement applies in fraud and fraudulent concealment cases. R. has not pleaded fraud or fraudulent concealment. Even if repressed memory cases are like fraud, as the dissent argues, because the wrongdoer's conduct makes evidence unavailable to the victim, post at 35, these similarities do not warrant waiving the objective verifiability requirement. The uncertainties in such cases require that injuries be objectively verifiable before the discovery rule is applied, just as in other cases.
The dissent argues that an objectively verifiable injury is not required in fraud and fraudulent concealment cases because of "the degree of culpability associated with the defendant's conduct", post at 36, and that no conduct is more reprehensible than sexual abuse of a child. While we deplore sexual abuse as much as the dissent, we are unable to find support in our decisions for the idea that the discovery rule should apply whenever the conduct complained of is especially egregious. The dissent states, "Obviously, it has been a factor." Post at 36. Yet no authority is cited. In Computer Associates we did not list egregiousness of alleged conduct as a factor governing application of the discovery rule because it cannot provide a workable standard. What seems egregious varies from time to time and person to person; judges have no special qualifications to make such determinations.
The dissent argues: "The wrong and the injury inflicted on R.V. was by its very nature unknown to her through no fault of her own. Nevertheless, the Court declines to apply its own rationale in this case." Post at 30-31. This is not true. We have assumed that R.'s injury was inherently undiscoverable. The dissent refuses to contend with the fact that R. cannot demonstrate an objectively verifiable injury. The dissent also argues: "The Court cannot have it both ways. If the injuries are obvious, ... they cannot be `inherently undiscoverable'." Post at 32. Actually, they can be. In Borderlon, to pick an obvious example, a surgical needle left in a patient's intestines cannot readily be seen or detected and is thus inherently undiscoverable, but when the needle is found and removed, the fact that it was left there during surgery becomes indisputable.
The essence of the dissent's position is that "[t]he perpetrator of childhood sexual abuse should not obtain the relief of knowing that after two years have passed, the victim cannot seek to hold him or her accountable in a court of law for an intentional tort absent `corroboration'." Post at 33. The flaw herewhich pervades the dissent's positionlies in the presumption that the defendant in a lawsuit is a perpetrator of abuse. The issue is not whether limitations should bar a sexual abuse claim assuming it is valid; the issue is whether limitations should bar such claim, as it would any other, irrespective of whether it is valid. The more certain it is that wrong has occurred, the more reason there is to apply the discovery rule. That is the objective verifiability standard. There is far less reason to believe that R.'s father abused her than there is that the defendant in Computer Associates misappropriated trade secrets, or that the defendant *25 in Gaddis left a surgical sponge in plaintiff's body. Had R. asserted her claim within the period prescribed by the Legislature, she would have been entitled to prosecute her claim despite any weaknesses in her proof. Because she did not do so, greater verifiability is necessary at the threshold for invocation of the discovery rule.
In sum, while we agree that today's decision should follow precedent as closely as possible, we have also tried, as in Computer Associates, to bring more consistency to this area of the law. The dissent's baseless insinuation that our decision today would impair rape prosecutions, post at 32, is empty rhetoric. Requiring objective verifiability for application of the discovery rule in civil cases is plainly unrelated to prosecutions for the crime of rape. Today's decision reiterates that exceptions to the legal injury rule should be few and narrowly drawna principle that the dissent endorses in every case but this one. The Court does not single out sexual abuse cases for special treatment; the dissent does. Today's decision follows, and is consistent with, our prior decisions.

B
The concurring opinions take up the debate over the admissibility of scientific evidence where E.I. du Pont de Nemours and Company v. Robinson, 923 S.W.2d 549 (Tex. 1995), left off. Justice Gonzalez favors the rule in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), adopted in Texas in du Pont, which requires a determination of the reliability of expert opinion before it is admitted in an effort to exclude what has come to be called "junk science". Justice Cornyn opposes assessing experts' reliability, considering this to be a "usurpation of the jury's historic role as the exclusive judge of the credibility of a witness." Post at 41 (Cornyn, J., concurring).
The issue is simply not in this case. None of the parties has ever raised it. We intimate no view on whether the evidence in this case was or was not admissible, and nothing we have written suggests the answer to that question, "obliquely", to use Justice Cornyn's word, post at 40, or otherwise. Evidence can be reliable and still not provide objective verification of an injury. An example is Robinson v. Weaver, 550 S.W.2d at 22, where a medical expert could have testified that a back injury had been misdiagnosed, but there was no way to objectively verify the "expert hindsight". By the same token, an injury can be objectively verified though evidence of causation is unreliable. An example is du Pont itself, where the damage to plaintiffs' pecan trees was undeniable, but the trial court held that the expert testimony on causation was unreliable and therefore inadmissible.
The concurring Justices' ongoing debate is simply out of place in this case. Much as they try to enlist this case in their war, it owes no allegiance to either side. This case does not speak to whether expert testimony about repressed memories is ever admissible or inadmissible, contrary to what Justice Gonzalez and Justice Cornyn appear to believe, and it does not make the demise of the rule in du Pont an "inevitability", as Justice Cornyn hopes. The inevitability is their refusal to lay down arms off the battlefield.

VII
Accordingly, we conclude that the discovery rule does not apply in this case. R. argues in this Court that the Open Courts provision of the Texas Constitution, Tex. Const. art. I, § 13, requires application of the discovery rule. We do not address this argument because it was not made in the trial court. City of San Antonio v. Schautteet, 706 S.W.2d 103, 104-105 (Tex.1986) (per curiam) (holding that Open Courts argument not made in the trial court cannot be made on appeal).
We do not, of course, impose any additional requirements on proof of a childhood sexual abuse case brought within the applicable limitations period. The objective verifiability requirement of the discovery rule does not apply in proving the case on the merits.
Nor are we insensitive to the terrible wrong of childhood sexual abuse and the strong public policies condemning it as reflected in the criminal statutes. False accusations *26 of abuse are equally devastating to families, however. As several state legislatures have already realized, the law must approach these difficult cases with an appreciation of all the interests affected. We believe the best approach is to apply the discovery rule in the same manner that we have applied it today in Computer Associates and would apply it in any other case.
The judgment of the court of appeals is reversed and the judgment of the district court is affirmed.
GONZALEZ and CORNYN, JJ., concur.
OWEN, J., dissents.
GONZALEZ, Justice, concurring.
Although I concur in the Court's judgment, I wish to make two additional points. First, the trial court correctly rendered a directed verdict in this case because R. failed to state a negligence cause of action. Second, expert testimony regarding repressed memories does not meet the guidelines for admissibility this Court adopted in du Pont v. Robinson, 923 S.W.2d 549 (Tex.1995).
R.'s pleadings allege that S., her father, "was negligent in committing the following acts: engaging or attempting to engage in sexual acts or contacts with the plaintiff; exposing himself while nude to the plaintiff; [and] exposing his genitals while in an aroused state in the presence of the plaintiff." Additionally R. claims that S.'s acts constituted a breach of R.'s right to privacy and negligent infliction of mental anguish.[1]
It is a matter of common sense that no one negligently commits pedophilia or incest. One does not engage in this type of conduct through inadvertence, thoughtlessness, or inattention. As recounted at length in the majority opinion, R. testified in support of her allegations that S. forced her to engage in numerous sexual acts, including intercourse. Such conduct can hardly be described as negligence. It is obvious that R.'s attorney alleged negligence so that S.'s homeowners' insurance policy would cover his misconduct. See Boyles v. Kerr, 855 S.W.2d 593, 604 (Tex.1993) (Gonzalez, J., concurring on rehearing) (noting that homeowners' insurance policies generally do not cover intentional acts). Because the conduct alleged was intentional and does not fit within the classic definition of negligence, the trial court's directed verdict should not be disturbed.
The second issue I wish to address is the admissibility of expert testimony on repressed memory. In Robinson, this Court set forth a number of non-exclusive factors to be considered by the trial court when deciding the admissibility of expert testimony:
(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique.
Robinson, 923 S.W.2d at 557.
The testimony of R.'s experts is not admissible under these guidelines. One reason that repressed memory theory is not admissible is because it cannot be empirically tested. The key question in determining whether a theory or technique can be classified as science is whether it can be tested empirically. "`Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 593, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (quoting Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation, 86 Nw.U.L.Rev. 643, 645 (1992)); see also Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific *27 explanation must be capable of empirical test."); Kihlstrom, Hypnosis, Delayed Recall, and the Principles of Memory, 42 Int'l J. Clinical & Experimental Hypnosis 337, 342 (1994) ("[T]here do not appear to be any internal criteriathat is, standards that can be applied to the statements themselvesthat can serve to reliably distinguish between accurate recollections and fabrications and confabulations.... In the absence of such independent corroboration, we have no means of reliably distinguishing between fact and fantasy."); Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability.").
Moreover, repressed memory diagnosis relies heavily upon the subjective interpretation of the expert. This reliance is a sobering reality in sexual abuse cases: "[E]xperts constitute a highly variable and therefore unreliable source of opinion formation in cases of alleged sexual abuse." Horner et al., The Biases of Child Sexual Abuse Experts: Believing is Seeing, 21 BULL. Am. ACAD. PSYCHIATRY L. 281, 286-87 (1993); see also Campbell, Repressed Memories and Statutes of Limitations: Examining the Data and Weighing the Consequences, 16 Am.J.Forensic Psychiatry 25, 32 (1995) ("The potential for psychotherapists altering and/or distorting the memories of their clients cannot be underestimated."); Watkins, Dealing with the Problem of "False Memory" in Clinic and Court, 21 J. Psychiatry & L. 297, 301 (1993) ("[I]t must be conceded that patients ... are especially vulnerable to suggestive influence from their doctors. Therapists, who are very aware of the prevalence and perniciousness of child abuse, may at times `push' their clients to recall such incidents.").
In addition, the potential error rate is high in cases of repressed memory. See Nash, Memory Distortion and Sexual Trauma: The Problem of False Negatives and False Positives, 42 Int'l J. Clinical & Experimental Hypnosis 346 (1994). This high rate of error is unacceptable in light of the devastating consequences false allegations of abuse can have on the accused and his or her family. Silberg, Note, Memory Repression: Should It Toll the Statutory Limitations Period in Child Sexual Abuse Cases?, 39 Wayne L.Rev. 1589, 1599 (1993). Finally, repressed memory theory has not been generally accepted within the scientific community. In fact, the American Psychiatric Association has admitted that "it is not known how to distinguish, with complete accuracy, memories based on true events from those derived from other sources." APA Board of Trustees' Statement on Memories of Sexual Abuse, 42 Int'l J. Clinical & Experimental Hypnosis 261, 262 (1994); see also Campbell, supra, at 27 (recognizing that, as of 1990, there was no laboratory evidence supporting the concept of repression); Spence, Narrative Truth and Putative Child Abuse, 42 INT'L J. CLINICAL & EXPERIMENTAL HYPNOSIS 289, 301 (1994) ("No matter how traumatic, this kind of instant recovery of an early memory would seem to violate a good deal of what we know about archival memory, long-term storage and decay, and fly in the face of conclusions that have been accumulating in the experimental study of memory for the past 60 years.").
There may be some value to repressed memory theory as a therapeutic tool, but because it does not meet the admissibility guidelines we have established, it should not be admitted as evidence. As one commentator has noted:
Asking these questions does not make us enemies of therapy, nor does it mean that we doubt the reality or the horror of childhood sexual abuse. We would only suggest that the "literal" and the "metaphorical" be respected as separate and distinct entities. If therapy chooses to deal with myth and metaphor ..., it would seem wise and prudent to appreciate the metaphor for what it isa symbolic representation rather than a literal re-creation. If therapy chooses to search for meaning in history ..., then memory must be recognized and appreciated as a creative mechanism in which fact and fiction are inextricably interwoven.
LOFTUS & KETCHAM, THE MYTH OF REPRESSED MEMORY 265-66 (1994). Given what we know today about the subject, expert testimony *28 regarding repressed memory is the type of junk science that should be kept out of our courtrooms under the guidelines set forth in Robinson.
OWEN, Justice, dissenting.
I respectfully dissent.
There are no simple answers to the very difficult issues surrounding childhood sexual abuse raised in this case. We know that thousands of children have been victims. One study indicates that there were 8,561 cases of childhood sexual abuse confirmed in Texas alone in 1990. TEXAS DEPARTMENT OF HUMAN SERVICES, 1990 STATUS REPORT: PROTECTIVE SERVICES FOR FAMILIES AND CHILDREN 9 (1991). The number of children sexually abused in the United States each year has been estimated to be between 60,000 and 100,000. Karp, Domestic Torts: Family Violence, Conflict and Sexual Abuse 154 (1989).
We know that the psychological scars from that abuse can continue into adulthood and in many cases, can impact the victims throughout their lives. Some victims develop sexual disorders; others may suffer from multiple personality disorders or borderline psychosis. Hood, The Statute of Limitations Barrier in Civil Suits Brought by Adult Survivors of Child Sexual Abuse: A Simple Solution, 1994 U.Ill.L.Rev. 417, 423 (1994); Westerlund, Women's Sexuality After Childhood Incest (1992) (discussing the wide range of sexual problems suffered by the survivor of incestuous sexual abuse). The symptoms may not manifest themselves until the victim is an adult. Hirsch, Women & Violence 135 (1981).
We also know that an allegation of sexual abuse can be devastating to the one accused and that there can be faulty memories, or worse, false accusations.
As time passes between the alleged abuse and the bringing of the claim, the ability of the victim to prove a meritorious cause of action and the ability of the wrongfully accused to defend themselves may diminish. However, the potential for unfounded claims exists even when suit is brought within two years following the alleged abuse. In deciding the case before us, this Court is confronted with competing policy considerations, and whatever route it chooses will result in an imperfect solution.
Recognizing the tensions and difficulties, I nevertheless dissent from the Court's decision and judgment. The distinctions drawn in today's decision between this case and cases where we have deferred the running of limitations are not sound. In the past, we have applied theories of fraud, fraudulent concealment, fiduciary duty, or the discovery rule to defer the running of limitations in cases involving a leaky roof, the failure of businessmen to read agreements they signed, false credit reports, self-dealing by corporate officers and directors, legal malpractice, a negligent vasectomy, and a negligent hemorrhoidectomy, to list a few examples.[1] I agree with the Court that the justifications we have given in some of our prior decisions for applying the discovery rule have been inconsistent and overly broad. 933 S.W.2d at 5-6. The Court does not, however, disavow any of our prior decisions. If we defer the running of limitations in legal malpractice, fraud and fraudulent concealment cases, and instances where there is a special relationship, we should not exclude childhood sexual abuse from the reach of the discovery rule where the victim's memory has been repressed.

I
Procedurally, the trial court directed a verdict in favor of the defendant S.V. at the close of R.V.'s evidence. The court of appeals reversed and remanded the case for trial. S.V.'s application in this Court presents essentially two points of error. The first is whether the discovery rule applies, and the second is whether there was some evidence that sexual abuse occurred.[2]
*29 The Court concludes there is some evidence of abuse, but that the discovery rule does not apply. In repressed memory cases, unless "objective verification" of abuse other than the testimony of the alleged victim and the testimony of experts is available, the statute of limitations is a bar. Victims with legitimate claims cannot prevail.
Under the statutes that apply to this suit, victims of childhood sexual abuse are faced with a two-year time period within which they may personally bring suit. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex.Gen.Laws 3242, 3252, formerly codified as TEX.CIV.PRAC. & REM.CODE § 16.003(a); TEX.CIV.PRAC. & REM.CODE § 16.001. This window is between the victim's eighteenth and twentieth birthdays.[3] A minor is not legally capable of bringing suit until he or she reaches the age of eighteen, as confirmed in the Court's recent holding in Weiner v. Wasson, 900 S.W.2d 316, 319 (Tex.1995). Often, the parents of an abused child will not bring suit on the minor's behalf at an earlier date because one of the parents is the abuser, because they are unaware of the abuse, because other family members are involved, or for any number of other reasons. But whether brought by the victim or someone on his or her behalf, suit for the sexual abuse of a minor must be filed on or before the minor's twentieth birthday or be barred by limitations, unless the discovery rule or some other rule of law applies.
Where the victim is able to recall, before the age of twenty, repressed memories of the abuse and the significance of that event or events, the Court recognizes that all of the evidence detailed in its opinion could be presented to the jury and would support a verdict for the victim. 933 S.W.2d at 22. The Court acknowledges that where the statute of limitations is not at issue, the jury would be free to conclude that repressed memories of abuse constitute evidence that abuse actually occurred. Id. at 19. The Court acknowledges that the result in this case would be entirely different if R.V. had filed suit four months earlier, even though the same concerns the Court identifies in repressed memory cases would still obtain. Id. at 8. The Court readily concedes that if suit had been filed within the two year window between R.V.'s eighteenth and twentieth birthdays, "the conflict in the evidence" as to the validity of repressed memory "would be for the jury to resolve." Id. at 19.
The Court concedes "there is much scientific evidence, both in the record of this case and in psychological literature, to support R.'s position." Id. at 19. Yet, the Court concludes this same evidence is not reliable enough to warrant the application of the discovery rule. The inability of psychological experts to corroborate the victim's memory with certainty is the basis for denying the applicability of the discovery rule absent "objective verifiability" in cases where the memory of abuse is repressed beyond the victim's twentieth birthday.
"Repressed" memories, the Court concludes, are legally distinct from other memories in discovery rule cases, even though many of the same deficiencies in the reliability of "ordinary" memories are present in cases where the abuse took place a decade ago, but suit was brought within the statutory window. Again, I recognize that the longer the passage of time, the more pronounced the problems of proof and of reliability may become for all parties. But if "repressed" memory can support a verdict in a suit brought before the victim reaches the age of twenty, there is no basis for denying the applicability of the discovery rule in cases where repressed memory is recalled after the age of twenty. As already noted above, there may be a middle ground between suits such as this one, brought by an alleged victim when she was twenty years and four months old, and suits brought forty or fifty years after the alleged abuse occurred. But we must deal with the statute before us. *30 Any demarcation of this nature should be made by the Legislature.
The Legislature has now enacted a five-year statute of limitations applicable to suits for personal injury arising from sexual assault or aggravated sexual assault, as those terms are defined in sections 22.011 and 22.021 of the Texas Penal Code. Tex.Civ. Prac. & Rem.Code § 16.0045. Under section 16.0045, limitations begin to run on the day the cause of action accrues. Id. at § 16.0045(a). The Legislature expressly provided that an action for injury resulting in death accrues on the death of the injured person. Id. at § 16.0045(b). By contrast, the Legislature could have, but did not provide that the limitations period for injuries not resulting in death commences on the date of injury. We have applied the discovery rule to a statute of limitations which left the phrase "accrual" undefined. See Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex.1990) (citing Kelley v. Rinkle, 532 S.W.2d 947 (Tex.1976), and Quinn v. Press, 135 Tex. 60, 140 S.W.2d 438 (1940)). Accordingly, an argument can be made that in cases that do not involve death, the discovery rule should apply. There is no indication in the legislative history of section 16.0045 that the Legislature intended to cut off suits where the victim's memory has been repressed. The construction of the new statute is not before us, however.

II
The Court's unwillingness to apply the discovery rule in this case is not supported by previous decisions of our Court. In repressed memory cases, the inability of the victim to recall the trauma and to bring suit is due to the wrongful actions of the sexual abuser. In a variety of contexts, we consistently have recognized that where the inability to know of an injury or claim was caused by the actions of the tortfeasor, limitations should be deferred. The same factors that have compelled us to defer the running of limitations in fraud and fraudulent concealment cases are applicable here. Further, we have held fiduciaries to a stricter standard in discovery rule cases. There can be no question that a parent who rapes or otherwise sexually abuses their child has breached a fiduciary duty.
The Court enumerates the evils it perceives would flow from applying the discovery rule in childhood sexual abuse cases. Claims in divorce cases would never be barred and would become more acrimonious, it asserts. 933 S.W.2d at 22-23. It is questionable how many spousal abuse cases involve repressed memory. Further, if a marriage involved abuse, that fact is generally part of a divorce proceeding in any event. If a parent has abused a minor child, the claim would not be barred in a divorce proceeding, even absent the discovery rule, until the child reaches twenty or, under the new statute, twenty-three. The fact that R.V. asserted her claims in her parent's divorce is somewhat unusual and does not portend a rush by adult sons and daughters to intervene in their parents' divorces.
The Court also argues that there would be "[n]o basis, ever" for putting a time limit on when suit could be brought. Id. at 22. Limitations would serve no purpose at all. Cutting off even some valid claims is the price of repose, the Court recites. Id. at 22. The danger of stale evidence and stale claims is too great. Id. at 22. However, these same arguments apply in discovery rule cases generally, and in cases where fraud, fraudulent concealment and a fiduciary duty have been at issue. We nevertheless have deferred the accrual of many causes of action.
Contrary to the Court's assertions, applying the discovery rule in this case would not create a "special limitations jurisprudence unique to sexual abuse cases." Id. at 23. We would be following the principles we have articulated in other of our decisions. The Court has aptly identified the "common thread" in prior decisions where we have deferred the running of limitations:
The common thread in these cases is that when the wrong and injury were unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff, accrual of the cause of action was delayed.
Id. at 7.
The wrong and the injury inflicted on R.V. was by its very nature unknown to her *31 through no fault of her own. The Court declines to apply its own rationale in this case.

A
The linchpin of the Court's decision today is its conclusion that repressed memory does not warrant the application of the discovery rule unless the sexual abuse is "objectively verifiable." 933 S.W.2d at 24. In so holding, the Court ignores the fact that physical evidence may have been available at the time of the molestation but repression of memory and thus the unavailability of such evidence is often the direct consequence of the abuser's reprehensible acts. Allowing the statute of limitations to preclude R.V.'s cause of action would violate the principle "deeply rooted in our jurisprudence" that "no man may take advantage of his own wrong." Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231, 232, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959) (holding that the plaintiff's claims were not time-barred where the defendant misrepresented the number of years in which the plaintiff had to sue), quoted in Farris v. Compton, 652 A.2d 49, 55 (D.C.1994). Because of the age of the victims and their psychological vulnerability, many years may pass before they are able to recall the event. In many cases, recollections do not occur until the victims are able to distance themselves from the physical presence and the emotional influence of the abuser.
It is disturbing that the Court requires "physical or other evidence" in this case in addition to the vivid (albeit recalled) memories of R.V. She testified directly and extensively about abuse at the hands of her father. Yet, the Court also requires:
a confession by the abuser [citation omitted]; a criminal conviction [citation omitted]; contemporaneous records or written statements of the abuser such as diaries or letters; medical records of the person abused showing contemporaneous physical injury resulting from the abuse; photographs or recordings of the abuse; an objective eyewitness's account; and the like.
933 S.W.2d at 15.
This is reminiscent of the days when the crime of rape went unpunished unless corroborating evidence, above and beyond the victim's testimony, was available. See Spohn & Horney, Rape Law Reform: A Grassroots Revolution & Its Impact 24-25 (1992) (discussing the origins of the common-law requirement that the testimony of a rape victim, unlike that of other crime victims, be corroborated, including fears of the "danger of false charges by vindictive or mentally disturbed women" and fear of "memory falsification"). The Court's opinion perpetuates the attitudes reflected in that era. Today in Texas, no corroboration is required to convict a criminal defendant of the rape of a minor. See Tex.Code Crim.Proc. art. 38.07. Similarly, no corroboration should be required of a victim of childhood sexual abuse who seeks to invoke the discovery rule in a civil suit.
The Court has legitimate concerns about preventing the litigation of stale or fraudulent claims. However, those same concerns exist in many other areas of the law where we do not require "objective verification" or corroboration of the claimant's testimony. For example, in cases of fraud, there is often a sharp conflict in the evidence as to whether an oral misrepresentation was made. In many legal malpractice and informed consent cases, there will not be "objective verification" or corroborating evidence. Similarly, in deceptive trade practices act cases, the unsubstantiated testimony of a claimant regarding alleged misrepresentations can support the jury's findings.
We have not required "objective verification" in fraudulent concealment cases. In Borderlon v. Peck, 661 S.W.2d 907, 909 (Tex. 1983), we remanded a medical malpractice case for trial finding that there was a fact issue as to whether fraudulent concealment extended limitations. There, a suture needle broke off during surgery and remained in Borderlon's intestines. Id. at 908. Dr. Peck testified that he informed Borderlon of this fact, which she denied. Id. The very existence of the wrongful actDr. Peck's failure to make a disclosureturned on whether the finder of fact believed Borderlon. No corroboration of her testimony was required. See also Kelley v. Rinkle, 532 S.W.2d 947, 949 (Tex.1976) (applying discovery rule to *32 libel by means of a false credit report, despite "the intangible nature of the evidence and of the injury itself").
In Willis v. Maverick, 760 S.W.2d 642, 646 (Tex.1988), we held that the discovery rule applies to legal malpractice cases, even though those cases may turn on "professional diagnosis, judgment, and discretion." The Court had previously refused to apply the discovery rule to a case involving medical misdiagnosis in Robinson v. Weaver, 550 S.W.2d 18, 21-22 (Tex.1977), largely because the plaintiff's case would hinge on expert testimony. That holding was disapproved in Willis:
The court's decision [in Robinson v. Weaver] was predicated upon the perceived enhanced danger of fraudulent and stale claims that might arise under the discovery rule. We conclude that the logic relied upon by the majority in Robinson is untenable as it relates to this case.
Willis, 760 S.W.2d at 646. The Court today nevertheless relies on Robinson as support. 933 S.W.2d at 5.
Our reluctance to find Robinson dispositive in Willis provided a clear signal that there are some cases in which our concerns about objective physical evidence, and our reluctance to rely on expert testimony to establish the injury, yield to other considerations. In Willis, we balanced the competing considerations, ultimately holding that "any burden placed upon an attorney by application of the discovery rule [in a legal malpractice case] is less onerous than the injustice of denying relief to unknowing victims." 760 S.W.2d at 646. Surely, any burden placed upon a child molester by the application of the discovery rule is less onerous than the injustice of denying relief to his or her victims.

B
The notion that an injury must be "objectively verifiable" was first articulated in those precise terms in our decision in Computer Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453 (Tex.1996). In that case, we identified two elements that seemed to unify most, but not all, of this Court's prior decisions as to when the discovery rule would apply: "(1) whether the injury is inherently undiscoverable; and (2) whether evidence of the injury is objectively verifiable." Id. at 456.
These two factors are useful in attempting to find some uniformity among the cases, but they do not constitute a hard and fast rule. I agree with the result in Altai and with the Court's effort to define narrowly the scope and availability of the discovery rule. I did not and do not agree that a standard of "inherently undiscoverable" and "objectively verifiable" is appropriate in all cases, particularly those involving fraud, fraudulent concealment, fiduciary duty, or some other special relationship. Id. at 463 (Owen, J., concurring). In the past, we have considered other factors, and we should continue to do so in the future, narrowly drawing the boundaries of the discovery rule.
The inconsistency between a rigid test of "inherently undiscoverable" and "objectively verifiable" and what we have considered in many of our prior decisions is exemplified in the Court's decision today. On the one hand, the Court insists that "inherently undiscoverable" is and has been a necessary element in applying the discovery rule. Yet, in the next breath, while attempting to find some legitimacy for requiring "objective verification" in every case, the Court cites cases where the injury was obvious and we nevertheless applied the discovery rule. 918 S.W.2d at 456. See Willis, 760 S.W.2d at 643 (attorney's error apparent in divorce decree); Weaver, 561 S.W.2d at 793 (negligent hemorrhoidectomy damaged nerves and muscles of plaintiff's rectum, causing loss of bowel control); International Bankers Life, 368 S.W.2d at 571 (stock transfer records and board meeting minutes reflected officers' and directors' misdealing); Ruebeck, 176 S.W.2d at 739 (roof leaked for ten years). The Court cannot have it both ways. If the injuries are obvious, which they were in many of the cases cited by the Court, they cannot be "inherently undiscoverable".
Even if the Court had in the past adhered to a rigid test of "inherently undiscoverable" and "objectively verifiable" (which it has not), such a rationale simply does not apply with *33 force in cases of childhood sexual abuse. See Lemmerman v. Fealk, 201 Mich.App. 544, 507 N.W.2d 226, 230 (1993) ("Adults who have repressed child sexual abuse bring to the courts unusual circumstances and injuries not readily conforming to the ordinary constructs on which periods of limitations are imposed.") (citing Petersen v. Bruen, 106 Nev. 271, 792 P.2d 18, 24 (1990)). See generally Rosenfeld, The Statute of Limitations Barrier in Childhood Sexual Abuse Cases: The Equitable Estoppel Remedy, 12 Harv. Women's L.J. 206, 211-12 (1989).
As Justice Holmes explained, statutes of limitations serve the important purpose of "preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Railway Express Agency, 321 U.S. 342, 348-49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944); see also Altai, 918 S.W.2d at 457; Murray v. San Jacinto Agency, Inc., 800 S.W.2d 826, 828 (Tex.1990); Willis, 760 S.W.2d at 644. Statutes of limitation also serve to prevent the bringing of fraudulent claims. Altai, 918 S.W.2d at 457. However, because the statute of limitations is already tolled for minors until they reach the age of majority under section 16.001(a)(1) of the Texas Civil Practice and Remedies Code, the evidence in childhood sexual abuse cases often will not be "fresh" even if the case is brought within the statutory period. See Tyson v. Tyson, 107 Wash.2d 72, 727 P.2d 226, 232 (1986) (Pearson, J., dissenting). Further, in many cases, there will be no objectively verifiable evidence that the abuse occurred, even if the suit is filed promptly after the alleged incident of abuse. HAUGAARD & REPPUCCI, THE SEXUAL ABUSE OF CHILDREN: A COMPREHENSIVE GUIDE TO CURRENT KNOWLEDGE AND INTERVENTION STRATEGIES 151 (1988) ("Assessment of the credibility of an accusation of child sexual abuse is difficult because there is seldom any physical evidence or witnesses other than the child.").
Statutes of limitations are meant to cut off plaintiffs who have slept on their rights. But a plaintiff who has repressed all conscious memory of abuse does not slumber voluntarily. We should "recognize the difference between the voluntarily dilatory plaintiff and the incest survivor who is incapable of realizing the fact and cause of her injuries at an earlier date." Cook & Millsaps, Redressing Wrongs of the Blamelessly Ignorant Survivor of Incest, 26 U.Rich.L.Rev. 1, 13 (1991).
We have also long recognized that statutes of limitation protect the defendant's interest in repose. Gautier v. Franklin, 1 Tex. 732, 740 (1847). I am not persuaded, however, that the defendant's interest in repose should carry the day in the context of childhood sexual abuse because of the degree of culpability associated with the defendant's actions, because it is the defendant's actions that have led to the delay, and because of the lifelong effects of abuse on the victim. See McCollum v. D'Arcy, 138 N.H. 285, 638 A.2d 797, 799 (1994) ("The plaintiff's interest in being compensated for injuries caused by the defendants' acts, especially where the abuse and its causal connection to the plaintiff's injuries were discovered decades after the abuse took place, outweighs any interest the defendants have alleged in putting such claims to rest."); Hammer v. Hammer, 142 Wis.2d 257, 418 N.W.2d 23, 27 (Ct.App.1987) (repose-interest rationale is "unpersuasive in incestuous abuse cases").
Other commentators have explained that:
In a civil incest action, however, the defendant's conduct has been so egregious and so atrocious that the defendant should not be entitled to be let alone merely because an arbitrary time frame has passed before the victim becomes fully aware of the fact and cause of her injuries.
Cook & Millsaps, supra, at 12. The perpetrator of childhood sexual abuse should not obtain the relief of knowing that after two years have passed, the victim cannot seek to hold him or her accountable in a court of law for an intentional tort absent "corroboration". See Rosenfeld, supra, at 212.
The Court concludes that this reasoning is flawed because it assumes that the defendant has abused a child. 933 S.W.2d at 24-25. In so saying, the Court loses sight of the inquiry before us. The legal question we must decide in this case is whether, assuming the plaintiff can adduce evidence of abuse that would support a verdict in her favor, limitations *34 bars the claim as a matter of law. If this case were tried to its conclusion, the finder of fact would make the ultimate determination of who is the abuser and who is the abused. But after today's decision, some, if not many, who are perpetrators of childhood sexual abuse will be able to rely on the statute of limitations to escape accountability under the civil law for their actions.

C
The sexual abuse of a child by their parent is a breach of fiduciary duty. See Consolidated Gas & Equip. Co. v. Thompson, 405 S.W.2d 333, 336-37 (Tex.1966) (listing parent-child relationship as a fiduciary one); Boyd v. Boyd, 545 S.W.2d 520, 524 (Tex.Civ. App.Houston [1st Dist.] 1976, no writ) (holding there is a fiduciary relationship between parent and child). We have held fiduciaries to a stricter standard in discovery rule cases.
The fiduciary duty between an attorney and client was found to "justif[y] imposition of the discovery rule" in Willis v. Maverick, 760 S.W.2d 642, 645 (Tex.1988). We further held in that case that a breach of the attorney's duty to disclose was tantamount to concealment. Id. In Willis, a lawyer allegedly assured his client that the divorce settlement he had negotiated would still require her consent before the family home could be sold despite the deletion of a provision allowing her to remain in the marital home until the couple's youngest child reached eighteen. Id. at 643. Even though the client knew of her attorney's action and even though the effect of the agreement was not inherently undiscoverable, we applied the discovery rule. We also made it clear that the discovery rule operated to protect the client even after the attorney-client relationship ceased to exist. Id. at 646-47 n. 2 (disapproving of McClung v. Johnson, 620 S.W.2d 644 (Tex. Civ.App.-Dallas 1981, writ ref'd n.r.e.)).
We have deferred the running of limitations in suits by a trust beneficiary against the trustee until the beneficiary knew of the acts of the trustee or had knowledge of facts which, in the exercise of due diligence, would have led to the discovery of those acts. Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 394 (1945).
The conduct of a fiduciary is measured by "finer loyalties exacted by courts of equity." Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197, 205 (1957). The existence of a fiduciary relationship affects the application of the rule that diligence is required in discovering fraud. Id. The fiduciary relationship may excuse a defrauded party from taking action that would be required in an arm's-length transaction. Id. We held in Courseview that a special relationship of trust and confidence between two businessmen and their respective companies excused the failure of one of them to read or examine agreements he signed that otherwise would have put him on notice of a breach of contract. Id. 312 S.W.2d at 206. That same relationship excused the failure to examine public records. Id. Cf. Mooney v. Harlin, 622 S.W.2d 83, 85 (Tex.1981) (action for fraudulent misrepresentation concerning a bequest in a will was barred by the statute of limitations because the claimant was charged with notice of the contents of the probate records).
In Courseview, we also cited with approval two cases that dealt with the fiduciary duty owed by a parent to their child. See Courseview, 312 S.W.2d at 205. The first was Dean v. Dean, 214 S.W. 505 (Tex.Civ.App.1919, no writ), a suit to set aside a deed procured by fraud. The court in Dean held that there is a relation of trust and confidence between a father and child, and the child may continue to trust the father, without making inquiry, until it comes into possession of facts that would put an ordinary person on inquiry. Id. at 509. Similarly, the court in Atkins v. Dodds, 121 S.W.2d 1010, 1017 (Tex.Civ. App.Amarillo 1938, writ dism'd by agr.), held that a child is entitled to rely upon the confidence it reposes in its parent and has no duty to investigate or to uncover a fraud perpetrated by the parent.
The Court agrees that S.V. owed a fiduciary duty to R.V., but concludes this is immaterial since she was not "misled". 933 S.W.2d at 23. But this misapprehends the fundamental principles that anchor our decisions in breach of fiduciary cases. If her testimony *35 was true (as we must assume it is), the failure or inability of R.V. to know of her injury was caused by the actions of her father. Fiduciaries may not benefit from their own misdeeds or use the effects of their own actions as a shield from liability. See also Evans v. Eckelman, 216 Cal.App.3d 1609, 265 Cal.Rptr. 605, 608-10 (1990) (stating that a fiduciary relationship between plaintiff and defendant explains application of the discovery rule and applying the discovery rule in a childhood sexual abuse case); Salten, Statutes of Limitation in Civil Incest Suits: Preserving the Victim's Remedy, 7 Harv. Women's L.J. 189, 208-09 (1984) (arguing that analogy between breach of fiduciary duty and childhood sexual abuse supports application of discovery rule in childhood sexual abuse cases); Thomas, Note, Adult Survivors of Childhood Sexual Abuse and Statutes of Limitation: A Call For Legislative Action, 26 Wake Forest L.Rev. 1245, 1280-81 (1991) (explaining that some courts have used fiduciary relationship to justify extending the discovery rule to childhood sexual abuse cases).
The doctrine of parent-child immunity does not encompass sexual abuse. "The immunity is limited to transactions that are essentially parental." Jilani v. Jilani, 767 S.W.2d 671, 673 (Tex.1988). It is confined to areas where the exercise of reasonable discretion by a parent should be free from interference by the courts. Id. at 672. Intentional torts, particularly rape, are not included within this scope. With regard to rape, our Court has held that early decisions in other states that precluded recovery were "primitive applications" of parental immunity that have since been abandoned. Felderhoff v. Felderhoff, 473 S.W.2d 928, 930 (Tex.1971). "The prevailing rule today is that in the commission of wilful, malicious and intentional wrongs against the child the parent has abandoned or abdicated his parental responsibilities and subjected himself to liability." Id. See also Aboussie v. Aboussie, 270 S.W.2d 636, 639 (Tex.Civ.App.Fort Worth 1954, writ ref'd).
In cases of incestuous childhood sexual abuse, "[t]o protect the parent at the expense of the child works an `intolerable perversion of justice.'" Hammer, 418 N.W.2d at 27 (quoting Allen, Comment, Tort Remedies for Incestuous Abuse, 13 Golden Gate U.L.Rev. 609, 631 (1983)). A special relationship between the parties, particularly in conjunction with an injury that is difficult to discover, is a factor that we have weighed heavily in other contexts when deciding to apply the discovery rule.

D
Our Court has for many decades recognized that fraud will prevent the running of the statute of limitations until the fraud is discovered or in the exercise of reasonable diligence should have been discovered. See, e.g. Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738 (1943). In Ruebeck, a roof installed by the defendant began leaking one year later. Id., 176 S.W.2d at 739. The leaks worsened over time. However, the plaintiffs did not remove the roof until nine more years had passed and did not file suit until eleven years after the roof was installed. Id. Nevertheless, this Court affirmed a judgment in the plaintiffs' favor. We upheld the jury's finding that the plaintiffs did not discover the fraud until the roof was removed and could not have done so at an earlier date. Id. at 740. The "fraud" in that case was the failure to construct the roof in the manner promised. I question whether the same result would be reached in light of more recent decisions that discuss what should put a reasonable person on inquiry and that discuss the distinction between a breach of contract and a tort. See, e.g., Wise v. Anderson, 163 Tex. 608, 359 S.W.2d 876, 879 (1962); Southwestern Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494-95 (Tex.1991). However, the basic principle remains sound. Where an injured party is ignorant of the injury or of the wrong due to the affirmative misdeeds of another, the perpetrator cannot rely on limitations.
The Court attempts to distinguish the principles we have set out in fraud and fraudulent concealment cases by saying "R. does not allege fraud or fraudulent concealment, nor could she. R. was not deceived into thinking that she was not being abused when she was." 933 S.W.2d at 8. Here again, the Court does not meet the essence of its prior *36 decisions. Fraud is not alleged by R.V., but the principles we have applied in fraud cases are pertinent. Taking R.V.'s assertions at face value, which we must, it was the wrongful, intentional acts of a child abuser that were the cause of her inability to know of her injury or her claim.
Although the Court has not in the past clearly articulated the reasons that the discovery rule applies in fraud cases, several factors seem to be at play, including the degree of culpability associated with the defendant's conduct and the fact that the wrongfulness of the defendant's conduct makes the injury inherently difficult to discover.
The Court misses the mark when it suggests that the egregiousness of the conduct has not been a factor in invoking the discovery rule in cases of fraud. 933 S.W.2d at 24. Obviously, it has been a factor. Fraud is intentional, tortious conduct and "vitiates whatever it touches." Morris v. House, 32 Tex. 492, 495 (1870). See also Altai, 918 S.W.2d at 456. When egregious conduct such as fraud causes one to be ignorant of an injury or wrong, we have deferred limitations until the wrong or injury is or should have been discovered. The alleged conduct of S.V. is said to have caused his daughter to repress her memories and to bury her recollections of the injuries he inflicted on her. Surely, if fraud is a basis for invoking the discovery rule when it prevents the claimant from coming forward sooner, childhood sexual abuse, which the Court concedes is "reprehensible," 933 S.W.2d at 24, should be accorded the same degree of intolerance.

E
In other cases, we have tolled the statute of limitations for policy reasons, unrelated to whether the cause of action was inherently undiscoverable or objectively verifiable. We did so just last term in a legal malpractice case. Sanchez v. Hastings, 898 S.W.2d 287 (Tex.1995). The widow of Sanchez discovered during the course of litigation over her husband's death that she had a cause of action against her deceased husband's employer, but that her attorney had failed to bring the action because of a conflict of interest. Id. at 288. We tolled the malpractice claim against her attorney until the underlying litigation concluded, even though her claim was not "inherently undiscoverable," but was in fact discovered. Id.
The Court contends this case is inapposite because our holding was based not on policy grounds but on the "practical impossibility of requiring a client to argue in one proceeding that his attorney acted properly and in a contemporaneous proceeding that his attorney was negligent." 933 S.W.2d at 24. Whether denominated as a practical consideration or a policy consideration, we deferred limitations on a basis other than "inherent undiscoverability." Moreover, there are legal malpractice suits that can proceed while the suit in which the alleged negligence occurred is ongoing. Thus, the "practical impossibility" (the term used by the Court today) of bringing suit was not the only consideration for deferring limitations. The Court ignores the additional basis articulated for our decision in Sanchez, grounded squarely on policy considerations: "[I]f the client must carefully scrutinize every stage of the case for possible missteps it would erode the trust between client and lawyer necessary for the successful prosecution of litigation." Sanchez, 898 S.W.2d at 288.
The Court attacks the use of the word "policy," asserting that taking policy considerations into account in discovery rule cases does not "appear to be grounded in anything other than one judge's personal views." 933 S.W.2d at 24. The choice of the word "policy" was the Court's in its decision in Sanchez. We said:
Our holding in Hughes was based in part on the policy that a client should not be forced to take inconsistent positions.... The policy in Hughes applies here.
Sanchez, 898 S.W.2d at 288 (emphasis added).

III
The Court concludes that the discovery rule should not apply in repressed memory cases unless there is corroborating evidence from which the abuse can be "objectively verified," and that the expert opinions offered *37 in this case do not suffice. Even were "corroboration" appropriate, the record provides it. There is direct testimony from the victim, supported by the opinions of reputable, experienced specialists that R.V. has been sexually abused and that she exhibits traits and behavior associated with sexual abuse. This is sufficient to allow the jury to resolve the conflicts in the evidence.[4]

A
As the Court recognizes, there is little dispute that the repression of traumatic memories does occur. 933 S.W.2d at 17. As one therapist explained:
In more extreme cases, the result of the client's attempt to defend herself from devastating memories of abuse is a complete lack of memories for extended periods of childhood. Given the pain and trauma inherent in memories of the sexual abuse, this amnesia can be understood as an unconscious attempt to defend against reexperiencing the victimization through memories. In some cases, it seems apparent that amnesia was the victim's only alternative for psychological survival....
DOLAN, RESOLVING SEXUAL ABUSE 7 (1991). These memories may surface after the statute of limitations has expired. Westerlund, supra, at 47 (noting that among the participants in her study, memories most commonly surfaced when the survivors were in their late twenties and early thirties). See also Watkins, Dealing with the Problem of "False Memory" in Clinic and Court, 1993 J.Psychiatry & L. 297, 302 (1993) ("The fact of the process of repression, contrary to assertions by some researchers, has been well supported, not only by the weight of thousands of patients in analytic therapies over the past 70 years, but also by solid experimental laboratory findings."); Dolan, supra, at 7 ("[m]emory disturbance among sexual abuse victims has been well documented, particularly in reference to partial or even complete amnesia for the original abuse experience" (citations omitted)); Whitehead, Note, Application of the Delayed Discovery Rule: The Only Hope for Justice for Sexual Abuse Survivors, 16 Law & Psychology Rev. 153, 158-59 (1992). As one of the experts who treated R.V. testified, "Repression is really the only defense mechanism that a very small child has."
Despite the Court's recognition that repression does occur, the Court insists that because repressed memories cannot be shown conclusively or with guaranteed accuracy, the trier of fact should not even be able to consider the victim's claim if limitations has otherwise run. Although I do not take issue with the Court's conclusion that the trier of fact would face complex issues in cases of repressed memories of childhood sexual abuse, this complexity does not preclude the application of the discovery rule. Undoubtedly the trier of fact in childhood sexual abuse cases will face a "tremendous burden," but this difficulty should not lead us to bar an adult survivor of childhood sexual abuse at the courthouse door.
The Court skillfully explains the "reconstructive process" of memory retrieval and the possibility that memories may be a distortion of historical truth. But the Court's description of the unreliability of memory applies to some extent to all memories, not just recovered ones. See Olio, Memory Retrieval in the Treatment of Adult Survivors of Sexual Abuse, 19 Transactional Analysis J. 93, 95 (1989); see also Watkins, supra, at 309.
Despite the Report of the American Medical Association's Council on Scientific Affairs that memories are not necessarily fully accurate and the American Psychiatric Association's conclusion that true and confabulated memories cannot be distinguished with complete accuracy, neither organization has concluded that repression and recovery of valid memories of sexual abuse do not occur. See AMERICAN MEDICAL ASS'N, COUNCIL ON SCIENTIFIC AFFAIRS, REPORT ON MEMORIES OF CHILD ABUSE, 3:44 (1994), reprinted in 48 INT'L J. CLINICAL & EXPERIMENTAL HYPNOSIS 114, 116 (1995); AMERICAN PSYCHIATRIC ASS'N, STATEMENT ON MEMORIES OF SEXUAL *38 ABUSE (1993). The AMA Council on Scientific Affairs Report acknowledges that, notwithstanding writings alleging that therapists implant false memories, "other research indicates that some survivors of abuse do not remember, at least temporarily, having been abused.... There are other instances in which recovered memories proved to be correct." AMERICAN MEDICAL ASS'N, COUNCIL ON SCIENTIFIC AFFAIRS, REPORT ON MEMORIES OF CHILDHOOD ABUSE, 3:34-41. Indeed, the majority concedes that "[t]here is overwhelming consensus that repression exists," but would dismiss any repressed memory claim on the basis that it may be very difficult to distinguish between memories that are true and those that are not. 933 S.W.2d at 17. But that is the domain of the trier of fact. For example, studies have shown that eyewitness testimony is often surprisingly unreliable. Stewart, Perception, Memory, and Hearsay: A Criticism of Present Law and the Proposed Federal Rules of Evidence, 1970 Utah L.Rev. 1, 10-17 (1970). S.V. did not challenge the admissibility of the testimony of R.V.'s experts on the basis that it was not scientifically reliable.
In this case the defendant had the benefit of cross-examining R.V. and her experts and would have had the benefit of presenting his own expert testimony attacking the validity of recovered memories, if the trial court had not granted the motion for directed verdict at the conclusion of R.V.'s case in chief. These are all matters that would have been considered by the trier of fact in determining both when the plaintiff discovered that he or she was abused and whether the underlying abuse actually occurred.
The Court also concludes that Dr. Powitsky's diagnosis that R.V. suffers from post-traumatic stress disorder cannot be considered objective verification because it presupposes the existence of some trauma and the fact that R.V. has been diagnosed with post-traumatic stress disorder "could not indicate what kind of trauma occurred, and more importantly, who caused it." 933 S.W.2d at 19. The task for the trier of fact in evaluating the import of a post-traumatic stress disorder diagnosis is not a simple one. But the defendant would be entitled to present expert testimony cautioning the jury of the dangers which the majority discusses and to present evidence that R.V.'s post-traumatic stress disorder stemmed from another traumatic event.

B
The testimony of qualified, reputable mental health experts should suffice as "corroboration". See Tyson v. Tyson, 107 Wash.2d 72, 727 P.2d 226, 232-33 (1986) (Pearson, J., dissenting) (accusing majority of displaying profound mistrust of psychological testimony); Lindabury v. Lindabury, 552 So.2d 1117, 1118 (Fla.Dist.Ct.App.1989) (Jorgenson, J., dissenting) (explaining that even though psychiatry is the "penultimate grey area," the plaintiff should still have an opportunity to present his or her case to the trier of fact).
Under California's statutory discovery rule, a plaintiff in a childhood sexual abuse case who is age twenty-six or older at the time suit is filed must submit certificates of merit, including a certificate from a nontreating mental health practitioner, setting forth facts showing:
... that the practitioner is not treating and has not treated the plaintiff, and that the practitioner has interviewed the plaintiff and is knowledgeable of the relevant facts and issues involved in the particular action, and has concluded, on the basis of his or her knowledge of the facts and issues, that in his or her professional opinion there is a reasonable basis to believe that the plaintiff had been subject to childhood sexual abuse.
CAL.CIV.PROC.CODE §§ 340.1(d), 340.1(e)(2). New Mexico's statute similarly provides that the plaintiff's claim must be corroborated, but that the corroboration requirement is satisfied by "competent medical or psychological testimony." N.M.Stat.Ann. § 37-1-30(A)(2). Such a course is preferable to the approach adopted by the Court today.
The testimony of three mental health experts corroborated R.V.'s testimony: Dr. Robert Powitsky, a forensic clinical psychologist, Dr. Michael Madigan, a medical doctor practicing in psychiatry with a Ph.D. in experimental psychology, and Alice Frazier, a licensed counselor with a master's degree in *39 psychology. All three testified that in their expert opinions R.V. had been sexually abused, that she repressed all conscious memory of the event, and that she did not recall the abuse until November of 1990, within two years of the date she brought suit. All three also testified that the phenomena of dissociation during traumatic events, including childhood sexual abuse, and the subsequent repression of those events are widely accepted in the literature of their fields. They also testified that they had encountered other people in their practices who had repressed memories.
Dr. Madigan, who diagnosed R.V. with post-traumatic stress disorder, testified that he did not believe that R.V. had fabricated her memories of sexual abuse because in such cases, the person usually suffers other forms of pathology, such as anti-social behaviors, manipulativeness, stealing, lying, and being dishonest in other parts of her life. Dr. Powitsky testified that the way in which R.V.'s memories surfaced, with the most traumatic memories surfacing last, was a typical sequence for the recovery of memories of sexual abuse.
All three experts testified that R.V. experienced "body memories" or procedural memories, including a gagging reaction, which are common to survivors of sexual abuse. Frazier testified that body memories are recognized as evidence that sexual abuse occurred, and that in her own practice she has seen a "sense of choking" on a persistent basis. Frazier explained that when a child is subjected to certain acts of sexual abuse by a male, there is a sense of choking and gagging. As the Court points out, the fact that R.V. has exhibited such a reaction "does not eliminate all possible causes except abuse," but it is corroborating evidence.
Dr. Powitsky testified that R.V.'s Minnesota Multiphasic Personality Inventory test showed that she fit the classic "V profile" of someone who has been abused. The results of psychological tests performed on her father, according to Dr. Powitsky, also fit the profile of one kind of sexual abuser. S.V. exhibited "narcissistic traits, such as self-centeredness, over-value, over-valuing himself in social situations, a very high need for affection, a very high need for recognition, high need for control, power issues, problems in being able to express feelings openly, especially negative feelings." He also testified that several aspects of S.V.'s Rorschach test were also consistent with those one would expect to see in a child abuser.
The Court reviews Frazier's treatment of R.V. through a critical lens, conjecturing that Frazier's bias could have influenced R.V. and that Frazier's techniques may have increased R.V.'s suggestibility. The Court then disclaims that criticism by stating that "[i]t may be that her treatment and diagnosis of R.V. were flawless." 933 S.W.2d at 18-19. In this review, the Court ignores the proper directed verdict standard. If the Court chooses to review the facts, it should do so in the light most favorable to R.V. Dr. Powitsky reviewed Frazier's deposition detailing her treatment of R.V. and testified that her method of treatment seemed appropriate. Further, R.V. was not in a therapy session when her first images of sexual abuse surfaced; she was away at college. Frazier testified that she never hypnotized R.V., but she did use a relaxation technique similar to hypnosis. Frazier also testified that she had never suggested to R.V. that she had been the victim of incest before she recovered her first memory, although she did tell R.V. that her relationship with her boyfriend "sounded like incest" to her. I agree that the corroborative testimony provided by R.V.'s experts is "inconclusive," but it does lend some objective support to her allegations. Even under the standard announced in Altai, a plaintiff seeking the benefit of the discovery rule is not required to provide "conclusive evidence."
Other circumstantial evidence also corroborates R.V.'s memories. She testified that her father tied her up with bandannas during several incidents of sexual abuse. Her mother B.V. similarly testified that S.V. had tied her up with headscarves during sexual relations. Other events recounted by R.V. paralleled experiences between her mother and father, and there was no indication that R. and B.V. had shared those recollections with one another. Although this evidence does not in and of itself prove that S.V. sexually *40 abused his daughter, it does provide some circumstantial corroboration of R.V.'s claims. Again, nothing in the record suggests that R.V. knew the details of her parents' sexual relations.
If any corroboration of R.V.'s testimony that she was abused by her father is required, the testimony of her mental health experts and the other circumstantial evidence offered by R.V. should be sufficient. The strict objective verifiability rule applied by the Court would mean that a childhood sexual abuser, who through his or her brutal acts caused his victim to repress all memory of the abuse, essentially would be insulated from liability, so long as he or she did not videotape the abuse, abuse others (who could then corroborate the victim's story), or get caught "in the act" before the statute of limitations has run.

* * * * * *
I am concerned that statutes of limitations, including section 16.003, have been steadily eroded by doctrines such as fraudulent concealment, the discovery rule, and by an expansive reading of the open courts provision of our Texas Constitution. However, our Court embarked down this path some time ago. While I may well not have reached the same conclusions as our Court in its past decisions, they remain part of our precedent.
Our prior decisions and equitable considerations weigh in favor of extending the discovery rule in the case before us.
CORNYN, Justice, concurring.
I withdraw my prior concurring opinion and substitute this one in its place.
I concur in the Court's judgment. I question, however, whether the Court's extended discussion of the tragic and no doubt embarrassing facts of this case is necessary to conclude that the discovery rule does not apply. While it is true, as the Court's opinion notes, that when reviewing a directed verdict the evidence should be viewed in a light most favorable to the person suffering the adverse judgment, the only question the Court purports to answer is whether R.'s allegations of sexual abuse are objectively verifiable. Thus, only the evidence relating to that issue needs to be reviewed. Additionally, although it disclaims any intention of doing so, the Court's obvious concern for the lack of scientific consensus about the reliability of repressed memories necessarily raises questions, not only about the objective verifiability of R.'s allegations for purposes of its discovery rule analysis, but also about the admissibility of expert testimony on this subject under the Court's recent decision in E.I. duPont v. Robinson, 923 S.W.2d 549 (Tex. 1995).
My first point needs little elaboration. The Court assumes without deciding that R. can satisfy one of the two elements required for the application of the discovery rule, the inherent undiscoverability element. The Court therefore addresses only the second requirement, that the allegations be objectively verifiable. 933 S.W.2d at 6. The plaintiff in this case, the Court observes, offers no objectively verifiable evidence: no confession by the abuser, criminal conviction, contemporaneous records or written statements of the abuser such as diaries or letters, medical records of the person abused showing contemporaneous physical injury resulting from the abuse, photographs or recordings of the abuse, objective eyewitness's account, or `the like.' 933 S.W.2d at 15. I agree with this assessment, but having reached this conclusion, I see no need for an extensive discussion of the intimate details of the parties' lives when these ordinarily private matters can have no bearing on the objective verifiability inquiry.
My second point is that the centerpiece of the Court's opinion is the validity of expert testimony about repressed memory syndrome, and in assessing such testimony, the Court obliquely implicates the admissibility of this evidence under Robinson. The Court writes: "Because the second requirement for applying the discovery rule is an objectively verifiable wrong, the central determination that must be made is whether recovered memories meet this requirement. The question whether recovered memories are valid has elicited the most passionate debate among scholars and practitioners, and the consensus of professional organizations reviewing the debate is that there is no *41 consensus on the truth or falsity of these memories." 933 S.W.2d at 17. Then, after a review of some of the available scientific literature, the Court concludes:
In sum, the literature on repression and recovered memory syndrome establishes that fundamental theoretical and practical issues remain to be resolved. These issues include the extent to which experimental psychological theories of amnesia apply to psychotherapy, the effect of repression on memory, the effect of screening devices in recall, the effect of suggestibility, the difference between forensic and therapeutic truth, and the extent to which memory restoration techniques lead to credible memories or confabulations. Opinions in this area simply cannot meet the "objective verifiability" element for extending the discovery rule.
933 S.W.2d at 19-20. If there were a "settled scientific view," the Court suggests, the objective verifiability element might be satisfied. 933 S.W.2d at 17. By contrast, the dissent argues that the testimony of a "qualified, reputable mental health expert[] should suffice" as verification. 933 S.W.2d at 38 (Owen, J., dissenting).
In Robinson, this Court followed the lead of the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), by adopting six nonexclusive factors to determine admissibility of expert testimony under Rule 702. Four members of the Court dissented from that decision, Robinson, 923 S.W.2d at 560 (Cornyn, J., dissenting, joined by Hightower, Gammage, and Spector, JJ.), not because we disagreed with the Court's desire to curb "junk science" in the courtroom, but because of the means the Court chose: usurpation of the jury's historic role as the exclusive judge of the credibility of a witness.
Aside from the role of amateur scientist that Robinson unfortunately thrust upon them, trial courts face additional problems in behavioral science cases like this one because these disciplines cannot be readily evaluated under the nonexclusive factors enunciated in Robinson. See Robinson, 923 S.W.2d at 557. Of the factors listed in Robinson, only the third (whether the theory has been subjected to peer review and/or publication) appears to have been satisfied in this case, and even this factor does not tip the scales either for or against admissibility because both champions and critics of repressed memory syndrome have published articles on this subject. Justice Gonzalez, the author of Robinson, goes so far as to argue in his concurring opinion that application of the Robinson standard will result in the exclusion of all expert testimony of uncorroborated repressed memories of child sexual abuse. Even though Robinson now plainly controls the admissibility of some expert testimony, it cannot reasonably be construed to control the admissibility of all expert testimony. There are some types of expert testimony to which the nonexclusive factors adopted in Robinson are clearly inapplicable. As one legal scholar has noted:
Scientific evidence is only part of the larger domain of expert testimony. In addition to listing scientific testimony, Rule 702 expressly refers to "technical, or other specialized knowledge." There are numerous examples of technical but nonscientific experts whose credentials normally include substantial formal instruction in the techniques of a discipline. Attorneys, historians, and musicians fall into this category. There are also many nonscientific experts who have informally acquired specialized knowledge through practical experience. This category includes auctioneers, bankers, railroad brakesmen, businesspersons, carpenters, farmers, security guards, and trapshooters.
Edward J. Imwinkelried, The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 Cardozo L.Rev. 2272, 2278 (1994) (footnotes omitted); see also Federal Judicial Center, Reference Manual on Scientific Evidence 84 (1994) (questioning applicability of Daubert to social sciences, including psychology, economics, sociology, and political science). Thus, Justice GONZALEZ cannot be correct when he contends that under Robinson or Daubert, evidence from any discipline that is incapable of being "empirically tested" is categorically inadmissible. 933 S.W.2d at 26.
*42 This case provides an example. Unlike some other scientific theories, theories or opinions about behavior, memory, and psychology depend largely on the subjective interpretation of the expert and usually do not have demonstrable rates of error. Scholars have observed that "the nature of certain social and behavioral science theories may be inherently inconsistent with Daubert criteria such as `falsifiability' and `error rates'" and that some new theories "have simply not been sufficiently developed as theories to allow for proper consideration of the guidelines offered by Daubert." Richardson et al., The Problems of Applying Daubert to Psychological Syndrome Evidence, 79 Judicature 10, 11, 12 (1995).
That Robinson should not apply to all types of expert testimony may also be inferred from the dissent's conclusion that uncorroborated expert testimony about repressed memory can alone satisfy the objective verifiability requirement of the discovery rule. 933 S.W.2d at 38 (referring to psychiatry as the "penultimate gray area"). The dissent not only argues that expert testimony can satisfy the objective verifiability requirement of the discovery rule, but also assumes that such expert testimony would be unquestionably admissible at trial:
In this case the defendant had the benefit of cross-examining R.V. and her experts and would have had the benefit of presenting his own expert testimony attacking the validity of recovered memories, if the trial court had not granted the motion for directed verdict at the conclusion of R.V.'s case in chief. These are all matters that would have been considered by the trier of fact in determining both when the plaintiff discovered that he or she was abused and whether the underlying abuse actually occurred.

933 S.W.2d at 38 (emphasis added). Recognizing the difficulties for the jury in reconstructing events occurring during R.'s minority with the aid of expert testimony, the dissent argues that these difficulties may be overcome by "expert testimony cautioning the jury of the dangers which the majority discusses and ... present[ing] evidence that R.V.'s post-traumatic stress disorder stemmed from another traumatic event." 933 S.W.2d at 38. In my opinion, Justice OWEN's argument would not be viable after Robinson if Justice GONZALEZ is correct about Robinson's scope.
As I have said before, I fear that the admissibility standard that the Court adopted in Robinson will prove unworkable in a wide variety of contexts in which Rule 702 of our Rules of Evidence is implicated, including cases like this one. See Robinson, 933 S.W.2d at 560 (Cornyn, J., dissenting). I believe the Court's opinion today demonstrates the inevitability of that conclusion.
GONZALEZ, Justice, concurring opinion on motion for rehearing.
The rule we adopted in E.I. DuPont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex.1995), was guided by the United States Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court appears to have intended that Daubert provide the exclusive standard for evaluating the reliability of expert testimony about anything characterized as science. See Daubert, 509 U.S. at 589 & n. 8, 113 S.Ct. at 2795 & n. 8 (distinguishing science from "technical or other specialized knowledge" also subject to scrutiny under Federal Rule of Evidence 702). That was our intent in adopting the Daubert rule in Texas. See Robinson, 923 S.W.2d at 557 (adopting Daubert rule to guide trial courts in "determining the reliability of the scientific evidence" presented under Texas Rule of Civil Evidence 702). But many things commonly represented and accepted as science cannot meet the Daubert-Robinson standard because they do not qualify under the definition of "science" set forth in Daubert.[1] They are not testable under the scientific method. As I discussed in my concurring opinion in the present case, repressed memory syndrome, *43 as that phenomenon is now understood, is one of these things.
As Justice Cornyn correctly recognizes, this case foreshadows larger issues than the admissibility of repressed memory syndrome. Under Robinson, many social and behavioral disciplines will undoubtedly suffer the same fate. Thus, we need to develop a standard or filter apart from Robinson to judge the validity of expert testimony based on the social sciences. A recent commentator has aptly summarized the problem:
Although the [view that Daubert-Robinson provides the exclusive standard for evaluating scientific expert testimony] is our preferred solution, it leaves no safe harbor for evidence that is widely viewed as scientific, is accepted as sound, but cannot meet the Daubert criteria. This appears to be a dilemma that the lower courts will have to resolve on their own....
Conley & Peterson, The Science of Gatekeeping: The Federal Judicial Center's New Reference Manual on Scientific Evidence, 74 N.C.L.Rev. 1183, 1204 (1996).
Rather than addressing this problem on a case-by-case basis, the bench and bar would be better served if we dealt with it head-on. I therefore suggest that we refer this matter to the Supreme Court Advisory Committee and the appropriate state bar committees for recommendations concerning a possible rule change by our Court. In the meantime, I suggest that trial courts apply Robinson across the board in determining the admissibility of scientific evidence.
NOTES
[1] There is no cause of action in Texas for negligent infliction of mental anguish. Boyles v. Kerr, 855 S.W.2d 593, 594 (Tex.1993).
[1] Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 739-40 (1944); Courseview v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197, 205-07 (1957); Kelley v. Rinkle, 532 S.W.2d 947, 949 (Tex.1976); International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 580 (Tex.1963); Willis v. Maverick, 760 S.W.2d 642, 645-47 (Tex. 1988); Hays v. Hall, 488 S.W.2d 412, 413-14 (Tex.1972); and Weaver v. Witt, 561 S.W.2d 792, 793-94 (Tex.1977).
[2] R.V.'s cause of action has been cast as one for negligence. S.V. has not questioned whether sexual abuse of a child, which is an intentional tort, may also constitute negligence. That issue is not addressed in this opinion.
[3] Effective June 15, 1995, a five-year statute of limitations is applicable to suits for personal injury as a result of sexual assault or aggravated sexual assault. Tex.Civ.Prac. & Rem.Code § 16.0045. The window for a victim to bring suit under this statute is between his or her eighteenth and twenty-third birthdays, absent the applicability of the discovery rule.
[4] There has been no contention that the expert testimony should not have been admitted or that it is not scientifically reliable. We do not reach any of the issues presented in E.I. duPont deNemours v. Robinson, 923 S.W.2d 549 (Tex.1995).
[1] Science is the process of generating and testing hypotheses. The initial inquiry is whether the proffered testimony is scientifically valid, and validity depends on testability. See Daubert, 509 U.S. at 591-95, 113 S.Ct. at 2796-97 (1993); Robinson, 923 S.W.2d at 555.